(b)    All distributions must be made in the following order and amounts:

(i)    to the Preferred Limited Partners in an amount up to any unpaid Earned Prioritized Payments, earned Adjustments and earned Charges to which any Preferred Limited Partners are entitled (as determined under the SBIC Act), to be apportioned among them as required by the SBIC Act;

(ii)    if all amounts required to be distributed under Section 7.01(b)(i) have been distributed, then at the election of the General Partner, to the Partners (whether or not each Partner is a taxpayer or is a tax exempt entity) in an amount up to the Maximum Tax Liability of the Partners, to be apportioned between the Preferred Limited Partners on the one hand and the General Partner and the Private Limited Partners on the other hand, as required by the SBIC Act (the distribution to the Private Partners shall be made as provided in Section 7.03(a));

(iii)    if all amounts required to be distributed under Sections 7.01(b)(i) and Sections 7.01(b) (ii)(if the General Partner has elected to make a distribution under Section 7.01(b)(ii)) have been distributed, then to the Partners in an amount up to the amount of the Retained Earnings Available for Distribution of the Partnership, to be apportioned among them in the following ratios:

(A)    if as of the date of the distribution there is Outstanding Leverage, then in the ratios stated in the SBIC Act; and

(B)    if as of the date of the distribution there is no Outstanding Leverage, then any amount to be distributed under Section 7.01(b)(iii) will be apportioned to the Preferred Limited Partners up to the amount of any Profit Participation payable to the Preferred Limited Partners following the redemption of their Preferred Limited Partnership Interests under the SBIC Act, if any, and the balance will be apportioned to the General Partner and the Private Limited Partners;

(iv)    if all amounts required to be distributed under Sections 7.01(b)(i), Section 7.01(b)(ii) (if the General Partner has elected to make a distribution under Section 7.01(b)(ii)), and Section 7.01(b)(iii) have been distributed, then any additional amount will be distributed and apportioned among the Partners in the following ratios:

(A)    if as of the date of the distribution there is Outstanding Leverage then in the ratios stated in the SBIC Act; and

(B)    if as of the date of the distribution there is no Outstanding Leverage, then any amount to be distributed under Section 7.01(b)(iv) will be distributed one hundred percent (100%) to the General Partner and the Private Limited Partners.

(c)    Except in the case of distributions made as permitted under Subsection (b), the right of the General Partner or any Private Limited Partner to receive any distribution from the Partnership as a result of such Partner's withdrawal, including any right any such Partner may have as a creditor of the Partnership with respect to the amount of any such distribution, is subordinate to any amount due to a Preferred Limited Partner or SBA by the Partnership.

7.02.    Distributions of Noncash Assets in Kind.

(a)    Subject to the provisions of the SBIC Act (including, without limitation, 13 C.F.R. § 107.1580), the prior approval of SBA and the provisions of this Section 7.02, the Partnership at any time may distribute in kind Noncash Assets.

(b)    Except as provided in the next sentence, any distribution of Noncash Assets will be made pro rata between the Preferred Limited Partners on the one hand and the General Partner and Private Limited Partners on the other hand (based upon the respective amounts which each of the two groups would be entitled to receive if the distribution were made in cash) with respect to the distribution of each Noncash Asset. With the prior approval of SBA, the Partnership may distribute cash to the Preferred Limited Partners in lieu of all or part of any Noncash Assets that they would otherwise receive in such distribution.

(c)    Distributions of Noncash Assets in kind before the redemption of all Preferred Limited Partnership Interests will only be made if the Noncash Assets are Distributable Securities. Distributions in kind of Noncash Assets which are Earmarked Assets after the redemption of all Preferred Limited Partnership Interests will be made only (i) if the Noncash Assets are Distributable Securities or (ii) if the Noncash Assets are not Distributable Securities, then with the prior approval of SBA (which must include the approval of the valuation of the Noncash Assets).

(d)    At any time that any amount due to a Preferred Limited Partner whose Preferred Limited Partnership Interest has been redeemed for purposes of the SBIC Act has not been paid in full, the Partnership will not make any distribution of Noncash Assets in kind unless the Partnership distributes to the Preferred Limited Partner such amount, up to the amount of the unrealized appreciation on the Noncash Assets to be distributed, as may be necessary to pay in full the amounts due to the Preferred Limited Partner under Section 4.07

(e)    Subject to the SBIC Act, Noncash Assets distributed in kind under this Section 7.02 will be subject to such conditions and restrictions as are legally required, including, without limitation, such conditions and restrictions required to assure compliance by the Partners and/or the Partnership with the aggregation rules and volume limitations under Rule 144 promulgated under the Securities Act.

7.03.    Apportionment of Distributions Among the General Partner and Private Limited Partners. All amounts to be distributed to the General Partner and the Private

Limited Partners will be apportioned among the General Partner and the Private Limited Partners as follows:

(a)    First, from that portion of the Maximum Tax Liability or other funds available for distribution pursuant to Section 7.01, the Partnership will distribute to the Private Partners from cash available no later than ninety (90) days after the close of each Fiscal Year and such additional times as may be permitted by the SBIC Act up to an amount, determined in the discretion of the General Partner, that is equal to a percentage of such Private Partner's share of the Net Profits allocated to such Private Partner for such Fiscal Year or other period. Such percentage shall be determined by the General Partner in its absolute discretion based upon an estimate of the highest marginal Federal income tax rates for corporations or individuals, whichever is higher, applicable to ordinary income and capital gain income and the proportions of such types of income earned by the Partnership during such Fiscal Year or such other period, plus the highest marginal California income tax rates for corporations or individuals, whichever is higher, applicable to ordinary income and capital gain income and the proportions of such types of income earned by the Partnership during such Fiscal Year or other period. The amount, if any, distributed pursuant to this Section 7.03(a) shall be reduced by all other distributions made in that fiscal year or other period (other than distributions pursuant to this Section 7.03(a)).

(b)    Second, one hundred percent (100%) to the General Partner and the Private Limited Partners (in proportion to their respective Partnership Percentages), until each of the Partners has been distributed pursuant to this Section 7.03(b) an amount equal to the Adjusted Capital Contribution of such Partner.

(c)    Third, eighty percent (80%) to the General Partner and the Private Limited Partners in accordance with their respective Partnership Percentages, and twenty percent (20%) to the General Partner.

7.04.    <u>Withholding</u>. Subject to the SBIC Act, the Partnership will at all times be entitled to make payments with respect to any Partner in amounts required to discharge any legal obligation of the Partnership to withhold or make payments to any governmental authority with respect to any Federal, state or local tax liability of the Partner arising as a result of the Partner's interest in the Partnership. Each such payment will be debited to such Partner's Capital Account, as provided in Section 6.03(b).

7.05.    <u>Distributions Violative of the Act Prohibited</u>. Anything contained in this Agreement to the contrary notwithstanding, no distribution may be made by the Partnership if and to the extent that such distribution would violate the Act.

7.06.    <u>Apportionment of Net Profits and Net Losses; Distributions in Respect of Interests Transferred</u>. If any interest in the Partnership is transferred during any Fiscal Year of the Partnership, the Net Profits or Net Losses attributable to such interest in the Partnership for such Fiscal Year shall be divided and apportioned between the transferor and transferee as they shall agree; provided, however, that if the Partnership does not receive, on or before January 31 of the year following the year in which the transfer occurs, a written notice stating the manner in which such

parties have agreed that such Net Profits or Net Losses are to be apportioned between them, then all of such Net Profits or Net Losses shall be allocated pro rata between the transferor and transferee based on the number of days each owned the interest in the Partnership during such year as such ownership is reflected in the books and records of the Partnership. Distributions of Partnership assets in respect of interests in the Partnership shall be made only to persons who, according to the books and records of the Partnership, are the owners of record of the interests in the Partnership in respect of which such distributions are made on the date determined by the General Partner as of which owners of interests in the Partnership are entitled to such distributions. The General Partner and the Partnership shall incur no liability for making distributions in accordance with the provisions of this Section 7.06, whether or not the General Partner or the Partnership has knowledge or notice of any transfer of ownership of any interests in the Partnership.

7.07.    Cash Distributions to the General Partner. If the General Partner receives a distribution in cash, other than a tax distribution pursuant to Section 7.01(b)(ii) or 7.03(a), the General Partner shall use fifty percent (50%) of the cash to pay first interest and then principal on any demand promissory note contributed by the General Partner to the Partnership pursuant to Section 5.04(a).

8.    Dissolution, Liquidation, Winding Up and Withdrawal.

8.01.    Dissolution.

(a)    The Partnership will be dissolved upon the first to occur of the following:

(i)    subject to Section 8.04 of this Agreement, the withdrawal, dissolution or bankruptcy of the General Partner or the occurrence of any other event that causes the General Partner to cease to be a general partner of the Partnership, including but not limited to an event of withdrawal (as defined in Section 17-101(3) and 17-402 of the Act) of the General Partner;

(ii)    the later of:

(A)    ten (10) years from the Commencement Date; or

(B)    two years after all Preferred Limited Partners have withdrawn from the Partnership and all Outstanding Leverage has matured; or

(iii)    the determination of the Private Partners to dissolve and terminate the Partnership as provided in Section 8.01(c).

(b)    The Partnership will not dissolve upon the withdrawal, dissolution, bankruptcy, death or adjudication of incompetence or insanity of any Private Limited Partner or Preferred Limited Partner.

(c)    The General Partner and a Majority in Interest of the Private Limited Partners may elect to dissolve the Partnership by giving notice to each Private Partner and SBA of the election. Any notice of an election to dissolve the Partnership may only be given: (i) ten (10) years after the Commencement Date; (ii) if all Outstanding Leverage has been repaid or redeemed; and (iii) if all amounts due the Preferred Limited Partners, SBA, its agent or trustee have been paid.

(d)    The General Partner may in the exercise of its sole discretion, elect to extend the date set forth in Section 8.01(a)(ii)(B) for an additional period of up to three years.

8.02.    Winding Up.

(a)    Subject to the SBA Act and Section 8.03, when the Partnership is dissolved, the property and business of the Partnership will be liquidated by the General Partner or if there is no General Partner or the General Partner is unable to act, a person designated by the holders of a Majority in Interest of the Private Limited Partners (the "Liquidator").

(b)    Within a reasonable period (and subject to the requirements of Treasury Regulation §§1.704-1(b)(2)(ii)(g) and 1.704-1(b)(2)(ii)(b)(2)) after the effective date of dissolution of the Partnership, the affairs of the Partnership will be wound up and the Partnership's assets will be distributed as provided in the SBIC Act and the Act. The liquidation shall be carried out as promptly as practicable with obtaining the fair value of the Partnership's Assets. The General Partner or Liquidator shall take full account of the Partnership's assets and liabilities and shall determine which assets shall be distributed in kind and which assets shall be liquidated. Notwithstanding the foregoing, the General Partner or Liquidator shall notify any Private Limited Partner that is a banking institution prior to making any distributions in kind and, upon written direction from such Private Limited Partner, shall sell such Portfolio Securities and distribute the net proceeds from such sale to such Private Limited Partner. Assets of the Partnership or the proceeds therefrom, if the General Partner or the Liquidator elects to liquidate the same, to the extent sufficient therefor, shall be applied and distributed in the following order:

(i)    To the payment and discharge of all the Partnership's debts and liabilities.

(ii)    To the setting up of such reserves as the General Partner or the Liquidator, as applicable, may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Partnership arising out of or in connection with the Partnership's business, provided that any such reserve will be held by the General Partner or the Liquidator, as applicable, for the purpose of disbursing such reserves in payment of any such liabilities or obligations and at the expiration of such period as the General Partner or Liquidator, as applicable, shall deem advisable (but in no event to exceed eighteen months from the date of liquidation, unless an extension of the time is consented to by a majority in interest of the Private Limited Partners), to distribute the balance remaining as provided in this Section 8.02(b).

(iii)     The balance of such assets or proceeds shall be distributed to the Preferred Limited Partner in accordance with the SBIC Act and then to the General Partner and Private Limited Partners in accordance with their respective positive Capital Account balances.

Distributions pursuant to this Section 8.02 may be distributed to a trust established for the benefit of the Partners for the purposes of liquidating Partnership Assets, collecting amounts owed to the Partnership, and paying any contingent or unforeseen liabilities or obligations of the Partnership arising out of or in connection with the Partnership. The assets of any such trust shall be distributed to the Partners from time to time, in the reasonable discretion of the General Partner or the Liquidator, as applicable, in the same proportions as the amount distributed to such trust by the Partnership would otherwise have been distributed to the Partners pursuant to this Agreement. An individual or entity that is a creditor of the Partnership by reason of its withdrawal or termination as a Private Limited Partner shall be entitled to receive distributions pursuant to this Section 8.02 only at the time of and from funds available for distribution to the Private Limited Partners and shall not have any priority in receipt of such funds senior to that of the Private Partners.

8.03.   Withdrawal of the General Partner.

(a)     Except as provided in Section 4.03 and Section 4.04, the General Partner may not withdraw as the general partner of the Partnership without the approval of sixty-seven percent (67%) in interest of the Private Limited Partners. If the General Partner withdraws as a general partner of the Partnership by notice from SBA as provided in the SBIC Act or otherwise, then the entire interest of the General Partner in the Partnership will be converted into an interest of a non-voting Private Limited Partner on the terms provided in Section 8.12, and the interest of the non-voting Private Limited Partner shall be disregarded with respect to calculating any required percentage of Private Limited Partners necessary to approve any action under this Agreement.

(b)     To the extent required by the SBIC Act, no transfer of the interest of the General Partner, or any portion of such interest, will be effective without the consent of SBA.

(c)     Except as provided in Section 8.03(a), 8.03(b), 8.12, 10.01(b), 10.01(c), 10.01(d) or 10.01(f), any person who acquires the interest of the General Partner, or any portion of such interest, in the Partnership, will not be a General Partner but will become a special private limited partner (a "Special Private Limited Partner") upon his written acceptance and adoption of all the terms and provisions of this Agreement. Such person will acquire no more than the interest of the General Partner in the Partnership as it existed on the date of the transfer, but will not be entitled to any priority given to the Private Limited Partners, their successors and assigns, in respect of the interest. No such person will have any right to participate in the management of the affairs of the Partnership or to vote with the Private Limited Partners, and the interest acquired by such person will be disregarded in determining whether any action has been taken by any percentage of the limited partnership interests.

(d)     Upon an event of withdrawal of the General Partner without continuation of the Partnership, the affairs of the Partnership will be wound up in accordance with the provisions of Section 8.02.

(e)     In the event of the death, disablement, incapacity, bankruptcy or withdrawal of an individual member of the General Partner or the dissolution, bankruptcy or withdrawal of any entity member of the General Partner, the Partnership will continue as provided in this Agreement.

8.04.   <u>Continuation of the Partnership After the Withdrawal of the General Partner</u>. Upon the occurrence of an event of withdrawal (as defined in the Act) of the General Partner, the Partnership will not be dissolved, if, within ninety (90) days after the event of withdrawal, sixty-seven percent (67%) or more in interest of the Private Limited Partners agree in writing to continue the business of the Partnership and to the appointment of one or more additional general partners (subject to the approval of SBA), effective as of the date of withdrawal of the General Partner. If the Private Limited Partners so agree to continue the Partnership, the interest of the former General Partner shall be terminated in accordance with Section 8.12.

8.05.   <u>Withdrawals of Capital</u>.   Except as specifically provided in this Agreement, withdrawals by a Partner of any amount of its Capital Account are not permitted.

8.06.   <u>Withdrawal by ERISA Regulated Pension Plans</u>. Notwithstanding any other provision of this Agreement, any Private Limited Partner that is an "employee benefit plan" within the meaning of, and subject to the provisions of, ERISA, may elect to withdraw from the Partnership in whole or in part, or upon demand by the General Partner must withdraw from the Partnership in whole or in part, if either such Private Limited Partner or the General Partner obtains an opinion of counsel to the effect that, as a result of ERISA, (i) the withdrawal of the Private Limited Partner from the Partnership to such extent is required to enable the Private Limited Partner to avoid a violation of, or breach of the fiduciary duties of any person under ERISA (other than a breach of the fiduciary duties of any such person based upon the investment strategy or performance of the Partnership) or any provision of the Code related to ERISA or (ii) all or any portion of the assets of the Partnership (as opposed to the Private Limited Partner's partnership interest) constitute assets of the Private Limited Partner for purposes of ERISA and are subject to the provisions of ERISA to substantially the same extent as if owned directly by the Private Limited Partner.

8.07.   <u>Withdrawal by Government Plans Complying with State and Local Law</u>. Notwithstanding any other provision of this Agreement, any Private Limited Partner that is a "government plan" within the meaning of ERISA may elect to withdraw from the Partnership in whole or in part, or upon demand by the General Partner must withdraw from the Partnership in whole or in part, if either such Private Limited Partner or the General Partner obtains an opinion of counsel to the effect that as a result of state statutes, regulations, case law, administrative interpretations or similar authority applicable to the "government plan", the withdrawal of such Private Limited Partner from the Partnership to such extent is required to enable the Private Limited

Partner or the Partnership to avoid a violation (other than a violation based upon the investment performance of the Partnership) of the applicable state law.

8.08.    Withdrawal by Government Plans Complying with ERISA. Notwithstanding any other provision of this Agreement, any Private Limited Partner that is a "government plan" within the meaning of ERISA may elect to withdraw from the Partnership in whole or in part, if the "government plan" obtains an opinion of counsel to the effect that, as a result of ERISA, (i) the withdrawal of the "government plan" from the Partnership to such extent would be required if it were an "employee benefit plan" within the meaning of, and subject to the provisions of, ERISA, to enable the "government plan" to avoid a violation of, or breach of the fiduciary duties of any person under ERISA (other than a breach of the fiduciary duties of any such person based upon the investment strategy or performance of the Partnership) or any provision of the Code related to ERISA or (ii) all or any portion of the assets of the Partnership would constitute assets of the "government plan" for the purposes of ERISA, if the "government plan" were an "employee benefit plan" within the meaning of, and subject to the provisions of, ERISA and would be subject to the provisions of ERISA to substantially the same extent as if owned directly by the "government plan."

8.09.    Withdrawal by Tax Exempt Private Limited Partners. Notwithstanding any other provision of this Agreement, any Private Limited Partner that is exempt from taxation under Section 501(a) or 501(c)(3) of the Code may elect to withdraw from the Partnership in whole or in part, if the Private Limited Partner obtains an opinion of counsel to the effect that as a result of applicable statutes, regulations, case law, administrative interpretations or similar authority, the withdrawal of the Private Limited Partner from the Partnership to such extent is required to enable the tax exempt Private Limited Partner to avoid loss of its tax exempt status under Section 501(a) or 501(c)(3) of the Code.

8.10.    Withdrawal by Registered Investment Companies. Notwithstanding any other provision of this Agreement, any Private Limited Partner that is an "investment company" subject to registration under the Investment Company Act, may elect to withdraw from the Partnership in whole or in part, or upon demand by the General Partner must withdraw from the Partnership in whole or in part, if either such Private Limited Partner or the General Partner obtains an opinion of counsel to the effect that, as a result of the Investment Company Act, the withdrawal of the Private Limited Partner from the Partnership to such extent is required to enable such Private Limited Partner or the Partnership to avoid a violation of applicable provisions of the Investment Company Act or the requirement that the Partnership register as an investment company under the Investment Company Act.

8.11.    Distributions on Withdrawal.

(a)    Subject to the provisions of Sections 5.02, 5.11 and 8.11(b), upon withdrawal by a Private Limited Partner under any provision of this Agreement, the General Partner will value the interest of the withdrawing Private Limited Partner and that value will be paid to the withdrawing Private Limited Partner when determined by the General Partner in the exercise of its sole discretion either (i) at the time and in the amounts that the withdrawing Private Limited Partner would have been entitled had it remained a Private Limited Partner with an interest

(including a Capital Account) in the Partnership equal to its interest at the time of withdrawal or (ii) at such times after withdrawal as the General Partner determines would permit the Partnership to make a reasonable distribution.

(b)    The Partnership will not make any distribution to any Partner in connection with its withdrawal under any provision of this Agreement or the Act, unless the distribution is permitted by the SBIC Act and SBA has given its consent to such distribution before the distribution is made.

(c)    Except in the case of distributions made as permitted under Subsection (b), the right of the General Partner or any Private Limited Partner to receive any distribution from the Partnership as a result of such Partner's withdrawal, including any right any such Partner may have as a creditor of the Partnership with respect to the amount of any such distribution, is subordinate to any amount due to a Preferred Limited Partner or SBA by the Partnership.

8.12.    <u>Liquidation of General Partner's Interest Upon Election of Private Limited Partners to Continue the Partnership</u>. If, upon occurrence of the resignation, dissolution or bankruptcy of the General Partner, or any other event that causes the General Partner to cease to be a general partner of the Partnership, the Partnership continues under a successor General Partner, the assets of the Partnership shall be valued in accordance with Section 3.10 (except that for all purposes determinations to be made by the General Partner shall be made by the successor General Partner) as of the date of the resignation, dissolution or bankruptcy. The Net Profits or Net Losses will be determined as if all assets had been sold at their fair market value as of the applicable date, and the aggregate amount of the General Partner's Capital Account as of such date shall be determined. The terminating General Partner's interest in the Partnership, including its then existing Capital Account, as so valued shall be converted to and treated going forward as the interest of a non-voting Private Limited Partner as provided in Section 8.03(a), and the terminating General Partner shall cease to be entitled to any allocation or distribution or any other right relating to the General Partner.

9.    <u>Accounts, Reports and Auditors</u>.

9.01.    <u>Books of Account</u>.

(a)    <u>SBIC Requirements</u>. The Partnership must maintain books and records in accordance with the provisions of the SBIC Act regarding financial accounts and reporting and, except as otherwise provided in this Agreement, generally accepted accounting principles.

(b)    <u>Records and Inspection</u>. The General Partner shall keep, at the Partnership's principal office, the Partnership's books and records, including (i) a current list of the full name and last known business or residence address of each Partner set forth in alphabetical order together with the contribution and the share in profits and losses of each Partner, (ii) a copy of the Certificate of Limited Partnership and all certificates of amendment thereto, together with executed copies of any powers of attorney pursuant to which any certificate has been executed, (iii) copies of the Partnership's federal, state and local income tax or information returns and reports, if any, for

the six most recent years, (iv) copies of the original of this Agreement and any amendments thereto, (v) financial statements of the Partnership for the six most recent fiscal years, and (vi) the Partnership's books and records for at least the current and past three fiscal years. Each Partner has the right, upon reasonable request, to inspect and copy during normal business hours any such Partnership records.

(c)    Confidential Information.    Notwithstanding any other provisions of this Agreement, unless otherwise required by law, the Partnership shall not be required to disclose any confidential or proprietary information received by the Partnership in connection with its investment operations and Portfolio Companies, except for any disclosure to the SBA required by the SBIC Act. Each Partner acknowledges that Private Limited Partners may be subject to laws, regulations or policies which require such Partners to disclose to federal, state or local government bodies, agencies or instrumentalities, or to the public information received by the Partner from the Partnership; however, that Partner shall take reasonable steps to exclude such information from disclosure, if an exclusion is reasonably available and shall give the Partnership prompt notice of any request for disclosure.

9.02.    Audit and Reports.

(a)    Audit.  The financial statements of the Partnership must be audited and certified as of the end of each fiscal year by a firm of independent certified public accountants selected by the Partnership.

(b)    Financial Statements.  The General Partner shall cause an annual report of the operations of the Partnership to be prepared within ninety days following the end of the fiscal year. Said annual report shall include a balance sheet as of the end of the fiscal year and an income statement for the fiscal year, audited by a firm of independent public accountants selected by the General Partner, and a statement showing the amounts allocated to such Partner pursuant to this Agreement during or in respect of such year, and any item of income, deduction, credit or loss allocated to the Partner for purposes of the Code pursuant to this Agreement.

(c)    Income Tax Information.  The General Partner shall provide each Partner within ninety days after the end of each fiscal year (i) the information necessary for the Partner to complete its Federal and state income tax returns, and (ii) if requested by a Private Limited Partner, a copy of the Partnership's Federal, state and local income tax or information returns for the year. The General Partner shall cause to have prepared and filed all required income tax returns for the Partnership.

(d)    Other Reports.  The General Partner shall transmit to the Limited Partners (i) within ninety (90) days after each quarter in each fiscal year a balance sheet, income statement and brief report on Portfolio Securities and (ii) within ninety (90) days after the end of the second and fourth fiscal quarters of each fiscal year a valuation report of the Partnership's Portfolio Securities prepared in accordance with Section 3.10.

9.03.   Fiscal Year. The fiscal year of the Partnership will be a twelve-month year (except for the first and last partial years, if any) ending on December 31.

9.04.   Banking and Portfolio Securities. All funds of the Partnership shall be deposited in such separate bank account or accounts as shall be determined by the General Partner, which funds shall be maintained separately from other bank accounts of the General Partner, or any other person or entity. All withdrawals therefrom shall be made upon checks signed by the General Partner or by any person authorized to do so by the General Partner. All Portfolio Securities of the Partnership shall be held by the General Partner separately from other securities held by the General Partner for its own account or the account of others.

9.05.   Annual Meeting. Except for any year which is shorter than three (3) full calendar quarters, an annual meeting of the Partners shall be held during each calendar year of the Partnership's term, at such time and place as the General Partner may designate in a notice to the Private Limited Partners delivered at least fifteen (15) days in advance of the scheduled date of each such meeting. The purpose of each such meeting shall be to discuss the Partnership's affairs and shall be purely informational in nature.

10.   Miscellaneous.

10.01. Assignability.

(a)   Private Limited Partner Transfer. No Private Limited Partner may assign, pledge or otherwise grant a security interest in its or his interest in the Partnership or in this Agreement, except:

(i)   by operation of law;

(ii)   to a receiver or trustee in bankruptcy for that Partner; or

(iii)   with the prior written consent of the General Partner (which consent may be withheld in the reasonable discretion of the General Partner);

provided in each instance:  (A) the proposed transferee assumes all the obligations of the original Private Limited Partner; (B) the General Partner has no reasonable belief that admitting the proposed transferee as a Private Limited Partner would be harmful to the Partnership or any Partner; (C) the proposed transfer would not, in the opinion of the Partnership's counsel, create a material risk of subjecting the Partnership or any Partner to any governmental regulation or require any registration which the General Partner believes to be significant; (D) each transferee agrees to become and assume the obligations of a Private Limited Partner pursuant to this Agreement on terms and conditions acceptable to the SBA and the General Partner; and (E) SBA shall have given its consent if such consent is required by the SBIC Act.

(b)    SBA Approval. No General Partner or Private Limited Partner may transfer any interest of ten percent (10%) or more in the capital of the Partnership without the prior approval of SBA.

(c)    General Partner Transfer. The General Partner may not assign, pledge or otherwise grant a security interest in its interest in the Partnership or in this Agreement, except with the prior consent of SBA and the prior approval of sixty-seven percent (67%) or more in interest of the Private Limited Partners. In these instances where such Private Limited Partner and SBA approvals have been obtained: (i) a transferee of all or a part of the interest of a General Partner shall be admitted to the Partnership as a general partner of the Partnership only if sixty-seven percent 67% or more in interest of the Private Limited Partners approves in writing the admission of such transferee; (ii) the admission shall be effective upon the filing of an amendment to the Certificate of Limited Partnership with the Secretary of State of the State of Delaware that indicates such transferee has been admitted to the Partnership as a general partner of the Partnership; and (iii) for all purposes the admission shall be deemed to have occurred, immediately prior to the time the transferor General Partner ceases to be a general partner of the Partnership. Such additional or successor General Partner is hereby authorized to and shall continue the Partnership without dissolution. Upon the filing of an amendment to the Certificate of Limited Partnership with the Secretary of State of the State of Delaware that indicates that a General Partner is no longer a general partner of the Partnership, such General Partner shall at that time cease to be a general partner of the Partnership. Any transferee of or successor in interest to a General Partner shall have only the rights and liabilities of a Private Limited Partner pending SBA's written approval of such transfer or succession.

(d)    Conditions to Transfer. No transfer of any interest in the Partnership will be allowed if such transfer or the actions to be taken in connection with that transfer would: (i) result in any violation of the SBIC Act; (ii) result in a violation of any law, rule or regulation by the Partnership; (iii) cause the termination or dissolution of the Partnership; (iv) cause the Partnership to be classified other than as a partnership for Federal income tax purposes; (v) result in the transfer of a limited partnership interest with a cost of less than $50,000 or cause the Partnership to be classified as a "publicly traded partnership" within the meaning of Section 469(k)(2) of the Code or for the purposes of Section 512(c)(2) of the Code; (vi) result in a violation of the Securities Act; (vii) require the Partnership to register as an investment company under the Investment Company Act; (viii) require the Partnership, the General Partner or the Investment Adviser/Manager to register as an investment adviser under the Investment Advisers Act; (ix) cause the Assets of the Partnership to be treated as assets of an employee benefit plan under regulations adopted pursuant to ERISA; or (x) result in a termination of the Partnership for Federal or state income tax purposes. The Private Limited Partner transferring its interest shall bear all reasonable costs of the Partnership in effecting such transfer. The transferor and transferee shall execute such documents and instruments and supply such opinions of counsel as the General Partner reasonably requests.

(e)    Substituted Private Limited Partners. Notwithstanding a transfer pursuant to Section 10.01, no transferee shall become a substituted Private Limited Partner

within the meaning of the Act unless the General Partner expressly and in writing consents to the substitution, and such transferee:

(i)     elects to become a substituted Private Limited Partner by delivering a written notice of such election to the General Partner;

(ii)    executes and acknowledges such other agreements and instruments as the General Partner may deem necessary or advisable to effect the admission of such person as a substituted Private Limited Partner, including without limitation the written acceptance and adoption by such person of the provisions of this Agreement and the execution of a subscription agreement; and

(iii)   pays a reasonable transfer fee to the Partnership which is sufficient to cover all reasonable expenses connected with the admission of such person as a substituted Private Limited Partner within the meaning of the Act; and if all steps shall be taken which, in the opinion of the General Partner, are reasonably necessary to admit such person under the Act and this Agreement as a substituted Private Limited Partner, then such person shall thereupon become a substituted Private Limited Partner within the meaning of the Act.

10.02.  Binding Agreement.  Subject to the provisions of Section 10.01, this Agreement is binding upon, and inures to the benefit of, the heir, successor, assign, executor, administrator, committee, guardian, conservator or trustee of any Partner.

10.03.  Gender.  As used in this Agreement, masculine, feminine and neuter pronouns include the masculine, feminine and neuter; and the singular includes the plural.

10.04.  Notices.  All notices under this Agreement must be in writing and may be given by personal delivery, telex, telegram, private courier service or registered or certified mail. A notice is deemed to have been given: (i) by personal delivery, telex, telegram, or private courier service, as of the day of delivery of the notice to the addressee; and (ii) by mail, as of the third day after the notice is mailed.  Notices must be sent to:  (i) the Partnership or the General Partner, at 310 Hamilton Avenue, Suite 202, Campbell, California 95008, telecopier no.:  408-378-3304, or such other address or addresses as to which the other Partners have been given notice; (ii) the Private Limited Partners, at the addresses in *Schedule A* attached to this Agreement (as *Schedule A* may be amended from time to time) or such other addresses as to which the Partnership has been given notice; (iii) the Preferred Limited Partner, at the address of the Investment Division of SBA or such other addresses as to which the Partnership has been given notice; and (iv) SBA, at the address of the Investment Division of SBA and, if so required under any Section of this Agreement, in duplicate at the address of the Office of the General Counsel of SBA.

10.05.  Consents and Approvals.  A consent or approval required to be given by any party under this Agreement will be deemed given and effective for purposes of this Agreement only if the consent or approval is: (i) given by such party in writing, and (ii) delivered by such party to the party requesting the consent or approval in the manner provided for notices to such party under Section 10.04.

10.06. <u>Counterparts</u>. This Agreement and any amendment to this Agreement may be executed in any number of counterparts with the same effect as if all parties executed and had signed one document. All counterparts shall be construed together and shall constitute one agreement, but each must be signed by the General Partner.

10.07. <u>Amendments</u>.

(a)    <u>General Amendments</u>. This Agreement may not be amended except by an instrument in writing executed by the holders of a Majority in Interest of the Private Limited Partners who have not withdrawn as of the effective date of that amendment and the General Partner, and approved by SBA. In addition, any amendment that: (i) increases the amount of a Private Limited Partner's Commitment requires that Partner's consent; (ii) may cause a Private Limited Partner or Preferred Limited Partner to become liable as a general partner of the Partnership requires the written consent of that Partner; or (iii) amends this sentence requires the consent of all Partners.

(b)    <u>Regulatory Amendments</u>. Notwithstanding anything in this Agreement to the contrary, upon the request of any Private Limited Partner the General Partner may, in its discretion, but subject to SBA approval, effect such amendments to this Agreement and the Certificate of Limited Partnership (the "Amendments"), without the consent of any Private Limited Partner, (i) as shall be needed in order to permit the requesting Private Limited Partner to remain in compliance with the provisions of ERISA, the Federal Deposit Insurance Act, as amended, the National Bank Act, as amended, the Bank Holding Company Act of 1956, as amended (the "Holding Company Act"), Title 29, Section 1002(3) of the United States Code and any similar laws or regulations, including state laws and regulations, thereunder ("Governmental Plan Regulations"), applicable to such Private Limited Partner, as in effect now or at any time during the term of this Agreement with respect to the investment of such Private Limited Partner in the Partnership; provided, however, that in the event the General Partner considers the Amendments to be onerous for the Partnership, the General Partner need not effect the Amendments or (ii) to preclude the assets of the Partnership from being considered to be "plan assets" for purposes of Section 3 of ERISA and regulations thereunder and Section 4975 of the Code. In the event the General Partner does not effect the Amendments after a request to do so by a Private Limited Partner and such Private Limited Partner delivers to the General Partner an opinion of counsel (including an attorney general's opinion or an opinion from a regulatory authority) to the effect that the Private Limited Partner must withdraw from the Partnership in order for such Private Limited Partner to be in compliance with ERISA, the Holding Company Act, the Federal Deposit Insurance Act, as amended, the National Bank Act, as amended, or the Governmental Plan Regulations unless the Amendments are effected, or in the event that the General Partner effects the Amendments and the Private Limited Partner delivers to the General Partner such an opinion of counsel to the effect that after the Amendments the Private Limited Partner must withdraw from the Partnership in order for such Private Limited Partner to be in compliance with ERISA, the Holding Company Act, the Federal Deposit Insurance Act, as amended, the National Bank Act, as amended, or the Governmental Plan Regulations, then the General Partner, subject to SBA approval, shall either (i) effect such Amendments as would enable such Private Limited Partner to be in compliance with ERISA, the Holding Company Act,

the Federal Deposit Insurance Act, as amended, the National Bank Act, as amended, or the Governmental Plan Regulations without withdrawing from the Partnership; or (ii) to the extent permissible under applicable securities laws cause the Partnership to distribute to such Private Limited Partner its pro rata share of assets of the Partnership, including cash and cash equivalents, or (iii) cause the Partnership to repurchase the Private Limited Partnership interest owned by such Private Limited Partner at a price equal to such Private Limited Partner's pro rata share of the net asset value of the Partnership payable to such Private Limited Partner upon termination of the Partnership, or as soon as practicable after the election by the General Partner to repurchase the Private Limited Partnership interest, payment therefor to be made by a promissory note of the Partnership which shall be payable to such Private Limited Partner upon the earlier of termination of the Partnership or eight years from the date of the note and which shall bear interest at a rate per annum equal to the rate that the Wall Street Journal publishes from time to time as the "prime rate" for unsecured commercial loans during the term of the Note or such lesser rate of interest as is equal to the maximum rate of interest permissible, or (iv) dissolve the Partnership. Any opinion delivered to the General Partner pursuant to this Section 10.07(b) must be acceptable to the General Partner (which acceptance shall not be unreasonably withheld).

(c)    The General Partner will distribute in the manner provided for notices in Section 10.04, to each Private Limited Partner, Preferred Limited Partner and SBA a copy of: (i) any Certificate of Amendment to the Certificate of Limited Partnership, and (ii) any amendment to this Agreement.

10.08.  Private Limited Partner Consents.  Each Private Limited Partner consents to: (i) the admission of Additional Private Limited Partners and the increase in any Private Limited Partner's Commitment in accordance with Section 5.05; (ii) the admission of any Preferred Limited Partner and the increase in any Preferred Limited Partner's Commitment in accordance with Section 4.06(b); (iii) the transfer of a Partner's interest in accordance with Section 10.01 and the admission of a substituted Partner under such transfer; (iv) any amendment of this Agreement or the Certificate of Limited Partnership necessary to effect such transfer or admission; (v) any amendment to this Agreement or the Certificate of Limited Partnership pursuant to Section 10.07(b); and (vi) any amendment of this Agreement or the Certificate of Limited Partnership to comply with or conform to any amendments of applicable laws governing the Partnership.

10.09.  Power of Attorney.

(a)    Appointment.  Each Private Limited Partner appoints each Principal, the General Partner, and each other person designed by the General Partner, with full power of substitution, as its true and lawful representative and attorney-in-fact, for it an in its name, place and stead, to make, execute, sign and file: (i) any amendments of this Agreement necessary to reflect: (A) the transfer of a Partner's interest; (B) the admission of a Private Limited Partner or substituted Private Limited Partner; (C) the admission of an Additional Private Limited Partner or the increase in the Commitment of a Private Limited Partner; (D) amendment of this Agreement adopted by the Partners; and (E) the consents set forth in Section 10.08; (ii) the exercise by the General Partner of any of the powers granted to it under this Agreement; (iii) the admission to the Partnership of any General Partner, Preferred Limited Partner or Special Private Limited Partner or

the withdrawal of any Private Limited Partner, a Preferred Limited Partner or General Partner, in the manner prescribed in this Agreement; (iv) to incorporate such changes as are required by the SBA or the SBIC Act; and (v) all instruments, documents and certificates which, from time to time, may be required by the law of the United States of America, the State of Delaware or any other state in which the Partnership determines to do business, or any political subdivision or agency thereof, to execute, implement and continue the valid and subsisting existence of the Partnership and in conformance to the provisions of this Agreement. Each Private Limited Partner authorizes each such attorney-in-fact to take any further action which such attorney-in-fact shall consider necessary or advisable in connection with any of the foregoing, hereby giving such attorney-in-fact full power and authority to do and perform each and every act or thing whatsoever requisite or advisable to be done in and about the foregoing as fully as such Private Limited Partner might or could do if personally present, and hereby ratifying and confirming all that such attorney-in-fact shall lawfully do or cause to be done by virtue hereof. The authorization set forth in this power of attorney includes the right to amend this Agreement to respond to comments from the SBA in connection with the Partnership's SBIC license application.

(b)    Attributes.    The power of attorney granted pursuant to Section 10.09 hereof:

(i)    is a special power of attorney coupled with an interest and is irrevocable except that such power shall terminate with respect to any particular person so appointed at the time such person ceases to be a principal or designee of the General Partner;

(ii)    if allowed by applicable law, may be executed by such attorney-in-fact by listing all of the Private Limited Partners executing any agreement, certificate, instrument or document with the single signature of any such attorney-in-fact acting as attorney-in-fact for all of them; and

(iii)    shall survive the delivery of an assignment by a Private Limited Partner of its interest in the Partnership, except that where the purchaser, transferee or assignee thereof has the right to be, or with the consent of the General Partner is admitted as, a substituted Private Limited Partner, the power of attorney shall survive the delivery of such assignment for the sole purpose of enabling such attorney-in-fact to execute, acknowledge and file any such agreement, certificate, instrument or document necessary to effect such substitution.

10.10.  Applicable Law.  This Agreement is governed by and shall be construed in accordance with the laws of the State of Delaware, without reference to its principles of conflict of laws, but the SBIC Act and other Federal laws shall be applicable as provided in this Agreement.

10.11.  Severability.  If any one or more of the provisions contained in this Agreement, or any application of any such provision, is invalid, illegal, or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained in this Agreement and all other applications of any such provision will not in any way be affected or impaired.

10.12. <u>Entire Agreement</u>. This Agreement, and all other written agreements executed by or on behalf of the General Partner and/or the Private Limited Partners and executed or approved by SBA, up to and including the date of this Agreement (such other written agreements, collectively, the "SBA Agreements"), state the entire understanding among the parties relating to the subject matter of this Agreement and the SBA Agreements. Any and all prior conversations, correspondence, memoranda or other writings are merged in, and replaced by this Agreement and the SBA Agreements, and are without further effect on this Agreement and the SBA Agreements. No promises, covenants, representations or warranties of any character or nature other than those expressly stated in this Agreement and the SBA Agreements have been made to induce any party to enter into this Agreement or any SBA Agreement.

10.13. <u>Section Headings</u>. Section and other headings contained in this Agreement are for reference purposes only and are in no way intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provisions hereof.

10.14. <u>Right to Rely upon the Authority of General Partner</u>. No person dealing with the General Partner shall be required to determine its authority to make any commitment or undertaking on behalf of the Partnership, nor to determine any fact or circumstance bearing upon the existence of its authority.

10.15. <u>Jurisdiction</u>. Any action to enforce, arising out of, or relating in any way to this Agreement may be brought and prosecuted in any Federal or state court or courts located in the State of Delaware or in Santa Clara County, California, and each Partner (a) consents to the jurisdiction of any such state court located in New Castle County, Delaware or Santa Clara County, California or any such federal court located in that county and to service of process by registered or certified mail, return receipt requested, or by any other matter provided by law, and (b) agrees not to object to venue of any such court; provided, however, that, without its written consent, neither a Preferred Limited Partner nor SBA consents to the jurisdiction of any state court.

10.16. <u>Description of Partnership</u>. The terms of this Agreement supersede any description of the Partnership appearing in any other document, including any offering documents.

10.17. <u>Written Consent</u>. Any action to be taken by the Partners may be taken at any time upon the written consent of such Partners holding at least the minimum interest in the Partnership that would be necessary to authorize or take that action.

10.18. <u>Partition</u>. Each Partner agrees that it shall not cause a partition of any of the Partnership's property, whether by court action or otherwise, it being agreed that any such action would cause a substantial hardship to the Partnership and would be in breach and contravention of this Agreement.

IN WITNESS WHEREOF, the parties to this Agreement have executed this Agreement as of the date first set forth above.

"General Partner"

**ALTOTECH VENTURES LLC**

By: _Edwin Wolf_

Its: _Manager_

"Private Limited Partner"

_____
*(Print Name of Private Limited Partner)*

_____
*(Signature)*

_____
*(Print Name of Signatory)*

_____
*(Title of Signatory, if applicable)*

<u>Schedule A</u>

As of _____, 2000

**ALTOTECH II, LP**
**CAPITAL COMMITMENTS**
**GENERAL PARTNER AND PRIVATE LIMITED PARTNERS**

| <u>General Partner</u> | <u>Commitment</u> |
|---|---|
| AltoTech Ventures LLC<br>2170 Stockbridge Avenue<br>Woodside, CA  94062<br>Telecopier:  650-369-7272 | $              * |

| <u>Private Limited Partners</u> | <u>Commitment</u> |
|---|---|

*One Percent of the Capital Contributions of the Private Partners.

<u>Schedule A-1</u>

Instrument of Admission or Increase in
Commitment for Preferred Limited Partner

**[The current version of this form is available on the SBA Internet web site at
<u>www.sba.gov/INV</u>, under "SBIC Forms," described as "Participating Security
Certification Form."]**

Exhibit A

## VALUATION GUIDELINES

General

The General Partner has sole responsibility for determining the Asset Value of each of the Loans and Investments and of the portfolio in the aggregate.

Loans and Investments shall be valued individually and in the aggregate at least semi-annually - as of the end of the second quarter of the fiscal year-end and as of the end of the fiscal year. Fiscal year-end valuations are audited as set forth in SBA's Accounting Standards and Financial Reporting Requirements for Small Business Investment Companies.

This Valuation Policy is intended to provide a consistent, conservative basis for establishing the Asset Value of the portfolio. The Policy presumes that Loans and Investments are acquired with the intent that they are to be held until maturity or disposed of in the ordinary course of business.

Interest-Bearing Securities

Loans shall be valued in an amount not greater than cost with Unrealized Depreciation being recognized when value is impaired. The valuation of loans and associated interest receivables on interest-bearing securities should reflect the portfolio concern's current and projected financial condition and operating results, its payment history and its ability to generate sufficient cash flow to make payments when due.

When a valuation relies more heavily on asset versus earnings approaches, additional criteria should include the seniority of the debt, the nature of any pledged collateral, the extent to which the security interest is perfected, the net liquidation value of tangible business assets, and the personal integrity and overall financial standing of the owners of the business. In those instances where a loan valuation is based on an analysis of certain collateralized assets of a business or assets outside the business, the valuation should, at a minimum, consider the net liquidation value of the collateral after reasonable selling expenses. Under no circumstances, however, shall a valuation based on the underlying collateral be considered as justification for any type of loan appreciation.

Appropriate unrealized depreciation on past due interest which is converted into a security (or added to an existing security) should be recognized when collection is doubtful. Collection is presumed to be in doubt when one or both of the following conditions occur: (i) interest payments are more than 120 days past due; or (ii) the small concern is in bankruptcy, insolvent, or there is substantial doubt about its ability to continue as a going concern.

The carrying value of interest bearing securities shall not be adjusted for changes in interest rates.

Valuation of convertible debt may be adjusted to reflect the value of the underlying equity security net of the conversion price.

<u>Equity Securities - Private Companies</u>

Investment cost is presumed to represent value except as indicated elsewhere in these guidelines.

Valuation should be reduced if a company's performance and potential have significantly deteriorated. If the factors which led to the reduction in valuation are overcome, the valuation may be restored.

The anticipated pricing of a Small Concern's future equity financing should be considered as a basis for recognizing Unrealized Depreciation, but not for Unrealized Appreciation. If it appears likely that equity will be sold in the foreseeable future at a price below the Licensee's current valuation, then that prospective offering price should be weighed in the valuation process.

Valuation should be adjusted to a subsequent significant equity financing that includes a meaningful portion of the financing by a sophisticated, unrelated new investor. A subsequent significant equity financing that includes substantially the same group of investors as the prior financing should generally not be the basis for an adjustment in valuation. A financing at a lower price by a sophisticated new investor should cause a reduction in value of the prior securities.

If substantially all of a significant equity financing is invested by an investor whose objectives are in large part strategic, or if the financing is led by such an investor, it is generally presumed that no more than 50% of the increase in investment price compared to the prior significant equity financing is attributable to an increased valuation of the company.

Where a company has been self-financing and has had positive cash flow from operations for at least the past two fiscal years, Asset Value may be increased based on a very conservative financial measure regarding P/E ratios or cash flow multiples, or other appropriate financial measures of similar publicly-traded companies, discounted for illiquidity. Should the chosen valuation cease to be meaningful, the valuation may be restored to a cost basis, or if of significant deterioration in performance or potential, to a valuation below cost to reflect impairment.

With respect to portfolio companies that are likely to face bankruptcy or discontinue operations for some other reason, liquidating value may be employed. This value may be determined by estimating the realizable value (often through professional appraisals or firm offers to purchase) of all assets and then subtracting all liabilities and all associated liquidation costs.

Warrants should be valued at the excess of the value of the underlying security over the exercise price.

## Equity Securities - Public Companies

Public securities should be valued as follows: (a) For over-the-counter stocks, take the average of the bid price at the close for the valuation date and the preceding two days, and (b) for listed stocks, take the average of the close for the valuation date and the preceding two days.

The valuation of public securities that are restricted should be discounted appropriately until the securities may be freely traded. Such discounts typically range from 10% to 40%, but the discounts can be more or less, depending upon the resale restrictions under securities laws or contractual agreements.

When the number of shares held is substantial in relation to the average daily trading volume, the valuation should be discounted by at least 10%, and generally by more.

Exhibit A - 3

Exhibit B

# PROMISSORY NOTE

applicable law, then the amount of interest payable on such date shall be reduced automatically to such maximum amount. If any interest or other charges, charged, paid or payable by the Maker in connection with this Note, or any other document delivered in connection herewith, results in charging, compensation, payment or earning of interest in excess of the maximum allowed by the applicable law as aforesaid, then any and all such excess shall be and the same is hereby waived by the Partnership, and any and all such excess previously paid shall be automatically credited against and in reduction of the principal due under this Note.

All payments on or in respect of this Note or the indebtedness evidenced hereby shall be made without set-off or counterclaim and free and clear of and without any deductions of any kind.

This Note evidences the obligations of the Maker (a) to pay the principal amounts set forth on the Schedule, (b) to pay interest, as herein provided, on the principal amount hereof remaining unpaid from time to time, and (c) to pay all other amounts that may become due and payable hereunder as herein provided.

The Maker will have the right to pay the principal of this Note in full or in part at any time or times without premium or penalty, provided that at the time of such payment all interest then owing on the principal amount prepaid is simultaneously paid in full.

The Maker and each other person liable hereunder in any capacity, whether as maker, endorser, surety, guarantor or otherwise, (i) waives presentment, demand, protest and notice of every kind respecting this Note, (ii) waives the right to a trial by jury, and (iii) waives any defense by reason of extension of time for payment or other indulgence granted by the Partnership.

This Note is made and executed under and in all respects will be construed and governed by the laws of the State of California, without giving effect to such state's principles of conflict of laws.

The Maker will upon demand pay to the Partnership the amount of any and all reasonable costs and expenses, including, without limitation, the reasonable fees and disbursements of its counsel (whether or not suit is instituted) that the Partnership may incur in connection with the enforcement of this Note.

The Maker may not assign or transfer this Note or any of its obligations under this Note in any manner whatsoever without the prior written consent of the Partnership. This Note may be assigned at any time by the Partnership.

This Note may be altered only by prior written agreement signed by the party against whom enforcement of any waiver, change, modification or discharge is sought. This Note may not be modified by oral agreement, even if supported by new consideration.

# DEMAND PROMISSORY NOTE

$_____                                        Dated: _____, 2000
                                                        Woodside, California

FOR VALUE RECEIVED, the undersigned, AltoTech Ventures LLC, a Delaware limited liability corporation (the "Maker"), promises to pay to the order of AltoTech II, LP, a Delaware limited partnership (the "Partnership"), without offset, at its offices at 2170 Stockbridge Avenue, Woodside, California 94062, or at such other place as the Partnership may hereafter from time to time designate in writing, ON DEMAND, in lawful money of the United States, the principal sum of up to _____ Dollars ($____) or such lesser amount as is shown on the Schedule attached to this Note, together with interest as hereinafter provided on each of the principal sums outstanding hereunder as set forth on the Schedule from time to time, until the entire principal sum or unpaid portion thereof has been paid in full as hereinafter provided. This Note is issued pursuant to an Agreement of Limited Partnership of the Partnership (the "Agreement"). Reference to the Agreement shall in no way impair the obligations set forth in this Note. The principal of this Note shall be the amount of the capital contributions that the Maker is required to contribute in its capacity as General Partner of the Partnership pursuant to Section 5.04 of the Agreement, to the extent such contributions have not been made in cash.

The Schedule attached to this Note shall set forth the dates and amounts of (a) the additions to principal, (b) the interest rate applicable to such addition, (c) payments of interest, and (d) repayments of principal.

Each addition to principal under this Note shall bear interest on the basis of a 365-day year on the unpaid balance of said principal amount from time to time outstanding, at a rate of interest equal to the applicable Federal rate for short term obligations under Section 1274(d) of the Internal Revenue Code at the time of the addition (the "Base Rate"). During any period when principal or interest has not been paid according to the terms of this Note, whether by reason of demand or otherwise, the principal and interest owing shall bear interest at the applicable Base Rate plus three percent (3%) per annum, compounded monthly.

All or any portion of the principal and interest under this Note shall be payable on demand.

All payments shall be applied first to accrued interest and then to principal. Principal shall be repaid in the chronological order in which it was incurred. Payments of principal and interest are to be made to the Partnership at the address designated above or at such other place as the Partnership shall have notified the Maker in writing.

Nothing herein, nor any transaction relating hereto, shall be construed or operate so as to require the Maker to pay interest at a greater rate than the maximum allowed by applicable law. If the amount of interest payable on any date would exceed the maximum amount permitted by

Time is of the essence under this Note.

No provision of this Note is intended to provide any rights or remedies to any person (including without limitation any creditor of any party hereto) other than the Maker, the Partnership and their respective successors and assigns.

IN WITNESS WHEREOF, the Maker has executed this Note effective as of the date first set forth above.

AltoTech Ventures LLC

By: _____

Its: _____

Schedule

To Demand Promissory Note
Dated: _____, 2000
Payor:  AltoTech Ventures, LLC

| Date | Amount of Principal | Interest Rate | Payments | | Initials |
|------|---------------------|---------------|-----------|----------|----------|
|      |                     |               | Principal | Interest |          |

# FIRST AMENDMENT TO
# LIMITED PARTNERSHIP AGREEMENT

This First Amendment (this "Amendment") to the Limited Partnership Agreement dated as of April 7, 2000 (the "Agreement") of AltoTech II, L.P., a Delaware limited partnership is entered into as of October 3, 2000, by and among the General Partner and the Private Limited Partners.

1.    Capitalized terms used in this Amendment and not otherwise defined have the meanings those terms have in the Agreement.

2.    Section 1.01 is hereby amended to add the following term:

"Banking Acts" means the Federal Deposit Insurance Act, as amended; the National Bank Act, as amended; the Federal Reserve Act, as amended; the Bank Holding Company Act of 1956, as amended; the Homeowners Loan Act, as amended, or the rules, regulations and written interpretations by the regulatory authority relating thereto or any other law, rule, regulation or written interpretation by such regulatory authority applicable to a bank, a bank holding company, savings and loan association, savings association holding company or any Affiliate thereof; and 13 CFR §107.460.

3.    Section 10.07(b) is hereby amended in its entirety to read as follows:

"(b)    Regulatory Amendments.    Notwithstanding anything in this Agreement to the contrary, upon the request of any Private Limited Partner the General Partner may, in its discretion, but subject to SBA approval, effect such amendments to this Agreement and the Certificate of Limited Partnership (the "Amendments"), without the consent of any Private Limited Partner, (i) as shall be needed in order to permit the requesting Private Limited Partner to remain in compliance with the provisions of the Banking Acts (following a change thereto after the date hereof), or ERISA and any similar laws or regulations, including state laws and regulations thereunder, applicable to such Private Limited Partner with respect to the investment of such Private Limited Partner in the Partnership; provided, however, that in the event the General Partner considers the Amendments to be onerous for the Partnership, the General Partner need not effect the Amendments or (ii) to preclude the assets of the Partnership from being considered to be "plan assets" for purposes of Section 3 of ERISA and regulations thereunder and Section 4975 of the Code.    In the event the General Partner does not effect the Amendments after a request to do so by a Private Limited Partner, then to the extent applicable the Private Limited Partner or the General Partner may pursue the remedies set forth in Sections 8.06 through 8.10."

4.    Except as amended by this Amendment, the Agreement shall remain in full force and effect.

*(Signature Page Follows)*

IN WITNESS WHEREOF, the undersigned have executed this Amendment as of the date first set forth above.

"General Partner"
**ALTOTECH VENTURES LLC**

By: *Glenn Wahl*

Its: *Manager*

"Limited Partners"

Arvanitidis, N.W.
Banca Commerciale Italiana (Suisse)
Barcode Enterprises Ltd.
Faith Mountain Enterprises Ltd.
Lee Shueh-Mien & Lee, Ching-Kung, Rev. Trust, 4/27/95
P. Herbert & Gloria F. Leiderman
Primus Technology Fund
Deborah Rieman
S.I. Technology Venture Capital Ltd.
Swire Holdings Ltd.
Synapse Fund I, LLC
Synapse Fund II, LLC
Thanos Triant
Zen Holdings International Ltd. (BVI)
Hoffman Family Trust
Gary Kremen
GBC Venture Capital Inc.
Andojo I, LP

**By powers of attorney**
**AltoTech Ventures LLC**

By: *Glenn Wahl*

Its: *Manager*

**Exhibit O-2**

*State of Delaware*     PAGE   1

## Office of the Secretary of State

I, EDWARD J. FREEL, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF LIMITED PARTNERSHIP OF "ALTOTECH II, LP", FILED IN THIS OFFICE ON THE TWENTY-NINTH DAY OF FEBRUARY, A.D. 2000, AT 3 O'CLOCK P.M.



3185950   8100

001101620

*Edward J. Freel, Secretary of State*

0290074

AUTHENTICATION:

DATE:                        03-01-00

## SECOND AMENDMENT TO
## LIMITED PARTNERSHIP AGREEMENT

This Second Amendment (this Amendment to the Limited Partnership Agreement dated as of April 7, 2000, of AltoTech II, L.P., a Delaware limited partnership, as amended by a First Amendment to Limited Partnership Agreement dated as of October 3, 2000, is dated as of December 10, 2000 (as amended, the Agreement), by and among the General Partner and the Private Limited Partners.

1.      Capitalized terms used in this Amendment and not otherwise defined have the meanings those terms have in the Agreement.

2.      The first sentence of Section 5.05 of the Agreement is hereby amended to read as follows:

> The General Partner may from time to time after the date of this Agreement and until March 31, 2001, without the consent of the Private Limited Partners, and on or after the end of that period for an additional three month period with the consent of a Majority in Interest of the Private Limited Partners admit one or more new Private Limited Partners (the Additional Private Limited Partners@) or permit any Private Limited Partner to increase its Commitment under the following terms and conditions, but in all cases subject to SBA's prior approval:

3.      Except as amended by this Amendment, the Agreement shall remain in full force and effect.

4.      This Amendment shall enter into effect as of the date of this Amendment when approved as required by the Agreement.

5.      This Amendment may be executed in counterparts, each of which shall be an original instrument, but all of which together shall constitute one instrument.

*(Signature Page Follows)*

IN WITNESS WHEREOF, the undersigned have executed this Amendment as of the date first set forth above.

General Partner

**ALTO TECH VENTURES LLC**

By: _____

Its:

Limited Partner

_____
*[Name of Limited Partner]*

_____
*[Signature]*

_____
*[Name of Signatory]*

_____
*[Title, if applicable]*

### THIRD AMENDMENT TO
### AGREEMENT OF LIMITED PARTNERSHIP OF
### ALTOTECH II, LP

This Third Amendment (this "Amendment") dated as of March 31, 2003, amends the Agreement of Limited Partnership dated as of April 7, 2000 of AltoTech II, LP, a Delaware limited partnership (the "Company"), as amended by a First Amendment dated as of October 3, 2000, and as amended by a Second Amendment dated as of December 10, 2000 (as so amended, the "Agreement"). Capitalized terms used in this Amendment and not otherwise defined shall have the meanings set forth in the Agreement.

The facts underlying this Amendment are as follows:

A.    The Partners wish to admit one or more Additional Private Limited Partners, permit existing Private Limited Partners to increase their Commitments and make certain changes in the Agreement as a result thereof.

NOW, THEREFORE, the parties agree as follows:

1.    Pursuant to Section 5.05 of the Agreement, the General Partner is authorized to admit on or after April 1, 2003 and on or before June 30, 2003, new investors as Additional Private Limited Partners (each a "New Additional Limited Partner") and to permit existing Private Limited Partners to increase their Commitment (to the extent of that increase, each a "New Existing Partner" and together with the New Additional Partners, the "New Partners").

2.    Notwithstanding any other provision of the Agreement, including but not limited to Sections 5.05(d), 6.02 and 6.03, Organization Expenses and other expenses of the Partnership (including Management Compensation) that accrued on or prior to March 31, 2003, shall not be allocated to any New Partners and to that extent the New Partner shall not be treated with respect to such items as if the New Partner had been a Private Limited Partner since the commencement of the Partnership, but rather as if the New Partner had been a Private Limited Partner commencing on April 1, 2003.

3.    This Amendment shall become effective as of the date first set forth above when approved by the General Partner, a Majority in Interest of the Private Limited Partners and the SBA.

4.    Except as amended by this Amendment, the Agreement shall remain in full force and effect.

*(Signature Page Follows)*

IN WITNESS WHEREOF, the Partners have executed this Amendment as of the date first set forth above.

"General Partner"

**AltoTech Ventures LLC.**

By: _____

Its: _____

"Private Limited Partners"

_____

*(Print name)*

_____

*(Signature)*

_____

*(Print name of signatory)*

_____

*(Title of signatory, if applicable)*

DT: #232179 v3 (4z5f03!.DOC) 120708-2

EXHIBIT C

### Exhibit H –2

## MANAGEMENT SERVICES AGREEMENT

THIS AGREEMENT is made on April 12, 2000, by and between AltoTech II, LP, a Delaware limited partnership (the "Partnership"), and AltoTech Management, LLC, a California limited liability company (the "Management Company").

The following is a recital of facts underlying this Agreement:

A.     The Partnership has applied to be licensed as a small business investment company ("SBIC") by the U.S. Small Business Administration ("SBA") pursuant to the Small Business Investment Act of 1958, as amended, and regulations promulgated pursuant to such legislation (such legislation and regulations being collectively referred to as the "SBIC Act").

B.     The Management Company desires to offer management and advisory services to the Partnership and the Partnership wishes to retain the services of the Management Company to provide such services.

C.     The Limited Partnership Agreement (the "Partnership Agreement") pursuant to which the Partnership is being organized, provides for the retention by the Partnership of an Adviser/Manager such as the Management Company, the payment of "Management Compensation" to such Management Company, and the payment by the Management Company of certain "Management Expenses." The terms Management Compensation and Management Expenses and other defined terms which are not defined in this Agreement shall have the meanings specified in the Partnership Agreement.

NOW THEREFORE, the parties agree as follows:

1.     ENGAGEMENT.  The Partnership retains the Management Company to provide the services specified in this Agreement, and the Management Company accepts such retention and shall provide such services during the term of this Agreement.

2.     SERVICES.  The Management Company shall provide the following services to the Partnership in connection with the Partnership's business operations:

    (a)     location, development, investigation, analysis and presentation to the Partnership of suitable investment opportunities, which are consistent with the Partnership's status as an SBIC and with the policies of the Partnership as established from time to time by the Partnership's General Partner;

    (b)     preparation of reports, research and economic and statistical data relating to proposed and existing investments of the Partnership;

    (c)     review of investment guidelines for the Partnership and proposal of revisions thereto in light of changing business and economic factors and portfolio growth;

    (d)     monitoring of investments, including enforcement of the Partnership's rights pursuant to agreements;

(e)    preparing or causing to be prepared such reports as the Partnership's officers and directors may from time to time request;

(f)    preparing or causing to be prepared all tax returns and tax information required by the Partnership;

(g)    preparing or causing to be prepared and filing or causing to be filed all reports the Partnership is required to record or file with governmental entities, including the SBA;

(h)    administration of the day-to-day operations of the Partnership, including maintenance of accounts, books and records as required under applicable laws and SBA rules and regulations;

(i)    furnishing the Partnership suitable office space which is identified as the Partnership's place of business;

(j)    maintenance of relations with professionals retained by the Partnership;

(k)    attendance to or arrangement for clerical and accounting services; and

(l)    such other services as may be mutually agreed upon.

3.    <u>MAINTENANCE OF STAFF AND FACILITIES</u>.  The Management Company shall maintain a staff trained and experienced in the business of the Partnership.  In addition to the service of its own staff, the Management Company shall, when necessary, arrange for and coordinate the services of other professionals and consultants.  The Management Company shall properly equip its office with such equipment and supplies as are reasonably necessary for performance of its obligations pursuant to this Agreement.  All costs and expenses incurred by the Management Company in connection with the hiring of employees and maintaining and equipping its office shall be borne by the Management Company and shall be incurred in the name of the Management Company and not in the name of the Partnership.

4.    <u>OPERATIONAL EXPENSES</u>.  The Management Company shall pay all Management Expenses of the Partnership as set forth in the Partnership Agreement, and Management Company shall not seek reimbursement from the Partnership for payment of Management Expenses.  If the Management Company pays any expenses of the Partnership that are not Management Expenses, the Partnership promptly shall reimburse the Management Company upon presentation of reasonable documentation of such expenses.

5.    MANAGEMENT COMPENSATION. For services under this Agreement, the Partnership shall pay the Management Company the Management Compensation at the times, and in the amounts specified in the Partnership Agreement. During the term of this Agreement, the Management Company shall be considered to be a third party beneficiary of those parts of the Partnership Agreement which pertain to the payment of the Management Compensation, define Management Expenses, provide for indemnification of the Management Company and its owners, directors, officers, employees, and other representatives and otherwise apply or pertain to the Management Company or the terms pursuant to which the Management Company provides services to the Partnership pursuant to this Agreement, and such provisions of the Partnership Agreement may not be amended or deleted without the Management Company's consent.

6.    TERM. This Agreement shall expire upon the first to occur of completion of liquidation of the Partnership pursuant to the Partnership Agreement, or thirty (30) days following either party giving notice of termination to the other party. This Agreement shall automatically terminate if assigned by the Management Company.

7.    INDEMNIFICATION. The Partnership shall indemnify the Management Company and its owners (whether shareholders, partners, members or otherwise), the Management Company's directors, officers, employees and other representatives to the fullest extent permitted by the Partnership Agreement. Such indemnification shall continue as to a person who has ceased to hold the position which entitled such person to indemnification and such indemnification shall inure to the benefit of the successors, assigns, heirs, personal representatives, executors, trustees, and administrators of such person.

8.    MANAGEMENT COMPANY'S ACTIVITIES. The Management Company may perform management services for entities other than the Partnership and may give advice and take action in the performance of its duties which may differ from the advice given or action taken with respect to the Partnership and the Partnership's investments.

9.    BOOKS AND RECORDS. The Management Company shall make its books, records, and employees pertaining to the Partnership available for inspection and consultation by the directors and officers of the Partnership's general partner.

10.    MATERIAL CHANGES. This Agreement may not be materially changed without the prior approval of the parties hereto and the SBA.

11.    MISCELLANEOUS. This Agreement is binding upon the parties hereto and their successors and assigns and shall be governed by and construed according to the laws of the State of California. This Agreement may be amended only in a writing signed by each of the parties, and terms of this Agreement may be waived only by a writing signed by the party to be charged with such waiver.

12.    NOTICES. Whenever any notice is required to be or may be given pursuant to this Agreement it shall be deemed given when sent to the party to receive such notice by registered or certified mail, by overnight courier, by facsimile or other electronic communication or personal delivery at the following address:

If to the Partnership:

AltoTech II, LP

Attn: Gloria C. Wahl
1130 Tournament Drive
Hillsborough, CA 94010
Facsimile No: 650/574-1870

If to the Management Company:

AltoTech Management, LLC
1130 Tournament Drive
Hillsborough, CA 94010
Facsimile No: 650/574-1870

IN WITNESS WHEREOF, and intending to be legally bound thereby, the parties hereto have executed and delivered this Agreement as of the date set forth above.

ALTOTECH II, LP

By:    AltoTech Ventures, LLC
Its:    General Partner

By:    _____
        Walter T. G. Lee

Its:    Manager

ALTOTECH MANAGEMENT, LLC

By:    _____
        Gloria C. Wahl

Its:    Manager

EXHIBIT D

1  **LINER YANKELEVITZ**
      **SUNSHINE & REGENSTREIF LLP**
2  Jonathan S. Kitchen (State Bar No. 80270)
   Sean M. Fischer (State Bar No. 189287)
3  One Post Street, Suite 2400
   San Francisco, CA  94104-5228
4  Telephone:    (415) 489-7700
   Facsimile:    (415) 489-7701
5
   Attorneys for Plaintiff
6  AltoTech II, LP, a California
   Limited Partnership
7

ORIGINAL
FILED

APR 1 4 2004

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

E-filing

SBA

8              UNITED STATES DISTRICT COURT
          NORTHERN DISTRICT OF CALIFORNIA
9                (San Francisco Division)

C 04  1464

10  ALTOTECH II, LP, a California Limited   )  Case No.
    Partnership,                            )
11                                          )  **COMPLAINT FOR**
               Plaintiff,                   )  1.  **FEDERAL SECURITIES FRAUD;**
12                                          )  2.  **STATE SECURITIES FRAUD**
          v.                                )      (Violation of California Corporations
13                                          )      Code § 25401);
                                            )  3.  **STATE SECURITIES FRAUD**
14  OPTIVA, INC., a California Corporation; )      (Violation of California Corporations
    PAVEL LAZAREV, an individual;           )      Code § 25400);
15  RODNEY FERGUSON, an individual;         )  4.  **FALSE STATEMENTS** (Violation of
    ALAN MARTY, an individual;  and G.      )      California Corporations Code § 1507);
16  ROBERT DURHAM, an individual,           )  5.  **BREACH OF CONTRACT;**
                                            )  6.  **BREACH OF COVENANT OF**
17             Defendants.                  )      **GOOD FAITH AND FAIR**
                                            )      **DEALING;**
18                                          )  7.  **BREACH OF FIDUCIARY DUTY;**
                                            )  8.  **FRAUD AND CIVIL**
19                                          )      **CONSPIRACY;**
                                            )  9.  **NEGLIGENCE;**
20                                          )  10. **UNJUST ENRICHMENT;**
                                            )  11. **ACCOUNTING;**
21                                          )  12. **UNFAIR BUSINESS PRACTICES;**
                                            )  13. **DECLARATORY JUDGMENT**
22                                          )      **AND SPECIFIC PERFORMANCE;**
                                            )  14. **RESCISSION;  and,**
23                                          )  15. **PERMANENT INJUNCTION**
                                            )
24                                          )
                                            )
25                                          )
                                            )  **JURY TRIAL DEMANDED**
26                                          )
27  _____      )

28  ::ODMA\PCDOCS\DOCS2\10047\8

COMPLAINT                     Case No. _____

Plaintiff AltoTech II, LP ("Plaintiff") alleges for its Complaint, upon knowledge as to its own acts, and otherwise upon information and belief, as follows:

### JURISDICTION AND VENUE

1.     This is a claim for equitable and monetary relief for breach of contract, breach of implied covenant of good faith and fair dealing, breach of fiduciary duty, fraud and civil conspiracy, negligence, unjust enrichment, an accounting, unfair business practices, federal securities fraud, corporate waste, involuntary dissolution, rescission and declaratory and injunctive relief.

2.     This Court has jurisdiction over the subject matter of the federal claim pursuant to 28 U.S.C. §§ 1331, because such claim arises under the laws of the United States. This Court has supplemental jurisdiction over the subject matter of the state claims pursuant to 28 U.S.C. § 1367(a).

3.     This Court has personal jurisdiction over each of the defendants because each defendant has purposeful contacts with California citizens and is doing business in the State of California in a manner that causes injury to Plaintiff. In addition, the conspiracy, to which all defendants belong, and other acts alleged herein, occurred in the State of California.

4.     Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(b) because each defendant transacted business in this district, a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district, and overt acts in furtherance of the conspiracy occurred in this district.

### THE PARTIES

5.     Plaintiff AltoTech II, LP is a California Limited Partnership with its principal place of business at One Lagoon Drive, Suite 100, Redwood Shores, California 94065 ("AltoTech"). AltoTech is an early stage venture capital fund focused on enabling technologies, software and services for the Internet, telecommunications and networking. Walter Lee ("Lee") and Gloria Wahl ("Wahl") are the General Partners and Co-Founders of AltoTech.

Case No. _____

6.     Defendant Optiva, Inc. is a California Corporation with its principal place of business at 377 Oyster Point Blvd, Unit 13, South San Francisco, California 94080 ("Optiva"). Optiva represents itself to be a developer and manufacturer of advanced nanomaterials for use in a wide range of optical, imaging and display applications.

7.     At all times material to this action Defendant Pavel Lazarev ("Lazarev") has been a resident of the State of California. Defendant Lazarev founded Optiva in 1997 and has been simultaneously the Chairman, Chief Technology Officer, Chief Executive Officer, and/or President of both Optiva and third party Quanta Vision, Inc.

8.     At all times material to this action Defendant Rodney Ferguson ("Ferguson") has been a resident of the State of California. Defendant Ferguson is a member of the Board of Directors of Optiva, and is a General Partner for J.P. Morgan Partners ("JPMP") where he manages new investments in nanotechnology applications.

9.     At all times material to this action Defendant Alan Marty ("Marty") has been a resident of the State of California. Defendant Marty is the Chairman of the Board and a member of the Board of Directors of Optiva, and is executive-in-residence for JPMP with responsibility for leading the JPMP's investments in the nanotechnology arena. Marty became acting CEO of Optiva from July, 2003 through December, 2003 and received financial remuneration from Optiva.

10.     At all times relevant to this action Defendant G. Robert Durham ("Durham") has been a resident of the State of Florida, and a member of the Board of Directors of Optiva.

**RELEVANT NON-PARTIES**

11.     Non-party Quanta Vision, Inc. ("QVI") is a corporation organized under the laws of Nevada and doing business in New York and California. At all times relevant to this case both QVI and Optiva have shared the same office address: (i) 1670 South Amphlett Boulevard, Suite 214, San Mateo, California 94402, and/or (ii) 377 Oyster Point Boulevard, Suite 13, South San Francisco, California 94080. At all times relevant to this case both QVI and Russian

1   Technology Group have shared the same office address at 1670 South Amphlett Boulevard, Suite

2   214, San Mateo, California 94402.

3       12.     Berne Schepman is a resident of the State of California and is a founder and

4   principal of RTG.

5       13.     RTG is a California Corporation with its principal place of business at 1670 South

6   Amphlett Boulevard, Suite 214, San Mateo, California 94402. Lazarev and Schepman are

7   founders and principals of RTG. At all times relevant to this case both QVI and RTG shared the

8   same office address at 1670 South Amphlett Boulevard, Suite 214, San Mateo, California

9   94402.

10      14.     Plaintiff anticipates that discovery in this case will implicate additional parties in

11  the tortious acts complained of herein, and Plaintiff will amend this Complaint to add those

12  additional parties at that time.

13                      **FACTUAL ALLEGATIONS**

14      **Overview**

15      15.     This case involves a shell game whereby Lazarev and other named and yet-to-be-

16  named defendants would take their alleged intellectual property rights, products and team of

17  executives and scientists on a dog-and-pony show around the globe, and sell and re-sell those

18  same rights to multiple investors. Lazarev and others pursued fund raising operations first in

19  Russia, then in New York and then in California, in the hopes that their deception would remain

20  undetected, while they pocketed or squandered millions of dollars from unsuspecting investors.

21      16.     By way of background, Defendant Lazarev is a Russian scientist who represents

22  himself to be a developer and manufacturer of advanced nanomaterials for use in a wide range of

23  optical, imaging and display applications (the "Technology").

24      17.     Lazarev and other defendants developed much of the Technology in Russia,

25  where they also sought investors for the development of their products.

26      18.     In approximately 1995, after successfully raising money in Russia by exploiting

27  the Technology, Lazarev and other named and unnamed defendants pursued fund raising

28                      3

                             COMPLAINT

                                                Case No. _____

1  operations in New York, and they established QVI. Lazarev and his group solicited investors for

2  QVI, and represented to those investors that QVI owned the Technology, that QVI would

3  continue to develop products utilizing such technology, and that QVI's officers and key

4  employees would devote 100% of their business time to QVI.

5      19.    After QVI had raised a significant amount of capital from investors in New York,

6  Lazarev and others set-up operations in California, and established Optiva in 1997. Lazarev and

7  others solicited investors for Optiva by making virtually the identical representations they had

8  made to the QVI investors: Optiva owned the Technology, Optiva would continue to develop

9  products utilizing such technology, and that Optiva's officers and key employees would devote

10  100% of their business time to Optiva.

11      20.    AltoTech fell prey to Lazarev and his cohorts in California in June 2002 when it

12  invested $1,500,000 in Optiva, Lazarev's bogus California company.

13      21.    Lazarev and others are now in the process of continuing this shell game, and are

14  on the verge of setting-up a new company in the United Kingdom, again using the same

15  Technology and resources which they have already "sold" to other companies.

16      22.    This lawsuit is an attempt by AltoTech to recover its investment, and to put an

17  end to the shell game.

18  **The Shell Game**

19      23.    The shell game began in Moscow in the 1980's and early-1990's, during

20  perestroika in the Soviet Union. It was then that, according to Lazarev, he was "incubating the

21  business and developing the core team." During that time, Lazarev and his group were funded in

22  large part by the Russian Academy of Sciences.

23      24.    After the fall of the Soviet Union in the early-1990's, Lazarev and his co-

24  conspirators were able to put their plan into place.

25      25.    In or about 1995, Lazarev and other named and unnamed defendants formed QVI.

26  Lazarev was QVI's Founder, Chief Executive Officer, Chairman of the Board and Chief

27  Technical Officer.

28  ::ODMA\PCDOCS\DOCS2\10047\8

4

COMPLAINT

Case No. _____

26.    For the next few years, Lazarev and others raised money to fund QVI, and to develop intellectual property, allegedly belonging exclusively to QVI. It is believed that a portion of the funds raised for QVI were sent to Moscow to fund additional research there.

27.    Approximately two years after forming QVI -- and with QVI's fundraising well underway -- Lazarev and others expanded their shell game to the West Coast, where they formed Optiva in California as a technology "spin-off" of RTG, and began to raise money to fund Optiva. Based on Optiva's representations that it "has principle research center is in Moscow" and that its operations in Moscow are "a key part of Optiva's strategic advantage," it is believed that a portion of the funds raised for Optiva were sent to Moscow to fund additional research there.

28.    Optiva represents itself to be a developer and manufacturer of advanced nanomaterials for use in a wide range of optical, imaging and display technologies. Optiva's technology is fundamentally similar to QVI's. Both companies are based on state-of-the-art techniques in nanomaterials, physics, chemistry and software development. Both exploit the physical and chemical properties of matter at the molecular level, and both have important commercial applications in enhancing visual images.

29.    Meanwhile, back in New York, QVI continued to operate and allegedly to develop further QVI's Technology, to raise funds back in New York.

30.    Non-party Prism Ventures LLC ("Prism") is an investor in QVI. Prism and its two principals, Judson Cooper and Joshua Schein, first met Defendant Lazarev in New York in 1997, when Prism was evaluating potential investment opportunities.

31.    Lazarev did not mention Optiva to Prism, or any technologies, products or applications he planned to develop apart from QVI. To the contrary, Lazarev stated that he would devote 100% of his business time to building QVI.

32.    In addition, Lazarev stated that he was the primary inventor of QVI's technology, and also planned to use other Russian scientists to assist in QVI's development. The technology

1    to which Lazarev referred to as "QVI's technology" was the same technology which he would

2    later refer to as "Optiva's technology" in discussions with AltoTech.

3        33.    On February 10, 1998, Lazarev agreed in writing to work full-time as QVI's Chief

4    Technical Advisor and to devote 100% of his energies to QVI (the "February 10, 1998

5    Commitment"). In fact, at the same time Lazarev entered into the February 10, 1998

6    Commitment, he simultaneously had plans to develop technology, applications and products

7    through Optiva.

8        34.    In or about September 1998, QVI prepared a "Corporate Overview" for the

9    purpose of soliciting potential investors. The "Corporate Overview" fails to mention anywhere

10    the connection between Optiva, Lazarev and other defendants.

11        35.    Lazarev and other defendants are believed to have raised in excess of $700,000 to

12    fund Optiva's competitor, QVI, while simultaneously raising money to fund Optiva.

13        36.    At the end of 2001, Lazarev informed Prism that he and other members of QVI

14    were working at Optiva. Lazarev further informed Prism that he was about to close another

15    round of financing for Optiva and promised that in February 2002, he would return to QVI and

16    bring with him the team of QVI scientists and management he had taken with him to Optiva.

17    This promise to Prism is in direct violation of Optiva's obligations to its shareholders.

18        37.    At about the same time -- in late 2001 -- Optiva began its efforts to raise

19    additional capital by authorizing the issuance and sale of shares of its Series C Preferred Stock

20    (the "Series C Financing").

21        38.    In or about late 2001, Steve Anderson, Optiva's Business Consultant, contacted

22    Andrew Wahl and informed him of the business opportunity and fund raising activities of

23    Optiva. Andrew Wahl informed AltoTech's General Partners and Co-Founders Wahl and Lee.

24    AltoTech expressed interest in learning more about Optiva's business plan and products as it had

25    been looking at nanotechnology as an investment, and scheduled an appointment to visit Optiva

26    and meet with Lazarev.

27

28    ::ODMA\PCDOCS\DOCS2\10047\8

Case No. _____

39.    In or about late 2001, Lee and Wahl met with Lazarev.  During the course of the meeting, Lazarev stated that all technology relating to Optiva's products and planned products belonged to Optiva.  Lazarev provided to Lee and Wahl a business plan dated November 10, 2001, and a "White Paper" entitled "Extraordinary Polarizers for LCD."  Lazarev also showed Lee and Wahl dozens of Russian patents, which Lazarev stated were already registered to Optiva in the United States by the U.S. patent office.

40.    Although AltoTech decided not to invest in Optiva in late 2001, in or about mid-January 2002, Optiva appointed new members to its Board of Directors, and revised its business plan.  Among the new Board Members, Optiva appointed Andrew Wahl as Executive Vice President and Chief Financial Officer, and later as President and Chief Executive Officer.  AltoTech believed that these were positive changes, and decided to reconsider whether to invest in Optiva.

41.    Andrew Wahl and Gloria Wahl are husband and wife.  After Andrew Wahl was appointed to Optiva, Lee and Gloria Wahl agreed that Gloria Wahl would not be involved in deciding whether AltoTech would invest in Optiva, in order to avoid any appearance of impropriety.

42.    In or about early- to mid-2002, Lee again met with Optiva representatives: Lazarev, Carl C. Cobb and Greg King ("King").  King gave a presentation regarding development of Optiva's products.  Throughout the presentation, Lazarev and King referred to "our patent portfolio" and "our technology."  The references to "our patent portfolio" and "our technology" were intended to lead AltoTech to believe that Optiva owned exclusively all technology related to Optiva's products and intended products.  Lazarev again showed Lee a wall full of framed patent certificates, and represented to Lee that the patents belonged to Optiva.

43.    In or about mid-2002, AltoTech attended other presentations where King and Lazarev presented information regarding Optiva's alleged products to AltoTech and to other potential investors.  King and Lazarev informed the prospective investors that all intellectual

1  property rights were securely placed in Optiva's name, and that Optiva's employees, scientists,

2  consultants and executives would be working exclusively for Optiva.

3      44.    At various times in 2002, Lazarev and others acting in concert with him

4  represented to AltoTech that the Technology could be used in a variety of applications. Lazarev

5  and others led AltoTech to believe that Optiva's value was, in part, based on the Technology, and

6  that the Technology could, and would, be used in multiple disciplines and industries.

7      45.    As a result, in or about mid-2002, AltoTech decided to participate in the Series C

8  Financing.

9      46.    In connection with the Series C Financing, Optiva provided to AltoTech the

10  following documents, without limitation:

11      (a)    "Confidential Business Plan, February 21, 2002, Thin Crystal Films for

12  Optical, Opto-Electronics & Semiconductor Applications;"

13      (b)    "Amended and Restated Co-Sale Agreement;"

14      (c)    "Information Statement, Series C Preferred Stock Financing," including

15  the "Summary of Terms" attached thereto as Appendix A;

16      (d)    "Amended and Restated Investor Rights Agreement;"

17      (e)    "Fifth Amended and Restated Articles of Incorporation of Optiva, Inc.;"

18  and,

19      (f)    "Amended and Restated Series C Preferred Stock Purchase Agreement."

20  All of the foregoing documents were presented to AltoTech, and signed by AltoTech, as

21  appropriate.

22      47.    In addition, on May 30, 2002, Optiva entered into a letter agreement with

23  AltoTech whereby Optiva acknowledged that AltoTech is licensed by the U.S. Small Business

24  Administration (the "SBA") as a small business investment company (an "SBIC") pursuant to the

25  Small Business Investment Act of 1958, as amended, and the regulations promulgated thereunder

26  (the "SBIC Letter"). (The SBIC Letter and the documents listed in the preceding paragraph are

27  collectively referred to as the "Written Agreements.")

28
              8
           COMPLAINT

Case No. _____

1    48.    Pursuant to Section 3 of the SBIC Letter, Optiva agreed to provide certain

2  information to AltoTech on a regularly scheduled basis.  Section 4 of the SBIC Letter requires

3  Optiva to permit AltoTech "to visit and inspect the properties and assets of [Optiva], to examine

4  its books of account and records, and to discuss [Optiva's] affairs, finances and accounts with the

5  Company's officers, senior management and accountants, all at such reasonable times as may be

6  requested by [AltoTech] or the SBA."

7    49.    Section 5 of the SBIC Letter requires Optiva to "furnish or cause to be furnished

8  to [AltoTech] such other information regarding the business, affairs and condition of [Optiva] as

9  [AltoTech] may from time to time reasonably request."

10    50.    In the "Summary of Terms" attached to the "Information Statement, Series C

11  Preferred Stock Financing" as Appendix A, Optiva agreed that "[e]ach such investor shall also be

12  entitled to standard inspection and visitation rights."

13    51.    In connection with the Series C Financing, Optiva repeatedly made the following

14  representations in the Written Agreements, which were also confirmed orally:

15        (a)    each officer and key employee would devote 100% of his or her business

16  time to Optiva's business;

17        (b)    neither Optiva, its officers, employees nor consultants had or would have

18  any direct or indirect ownership interest in any company which competed with Optiva;

19        (c)    Optiva's key officers would enter into employment agreements with

20  Optiva which would protect the interests of the owners of the Series C Preferred Stock;

21        (d)    Optiva would not take any action to effect any fundamental change to its

22  business;

23        (e)    Optiva would not transfer, license or otherwise jeopardize Optiva's

24  intellectual property;

25        (f)    each officer, employee and consultant of Optiva had executed a

26  proprietary information and assignment of inventions agreement, whereby all present or future

27  intellectual property rights had been assigned to Optiva;

28  ::ODMA\PCDOCS\DOCS2\10047\8

1                (g)     Optiva had valid, exclusive, title, ownership and legal rights to all patents,

2  trademarks, service marks, trade names, copyrights, trade secrets, information, proprietary rights

3  and processes employed by or proposed to be employed by Optiva;

4                (h)     all patents and intellectual property relating to the Thin Crystal Film

5  related technologies had been either derived under Optiva or had been fully assigned to Optiva;

6  and,

7                (i)     Optiva's products had been laboratory tested and were ready for

8  commercial production.

9       52.    In reliance upon the foregoing representations, including all representations set

10  forth in writing, AltoTech purchased on or about June 14, 2002, 1,363,636 shares of Series C

11  Preferred Stock for the aggregate purchase price of $1,500,000.  A portion of those funds was

12  sent to Moscow to fund additional research there.

13       53.    Shortly after the June 14, 2002 close of the Series C Preferred Stock, Optiva

14  began its efforts to raise even more money by authorizing the issuance and sale of additional

15  shares of its Series C Preferred Stock (the "Second Series C Financing").

16       54.    In connection with the Second Series C Financing, in approximately late 2002,

17  Lazarev and other Optiva employees presented to potential investors false information relating to

18  the viability and development of Optiva's products and planned products.

19       55.    Andrew Wahl (then acting as Optiva's President and Chief Executive Officer),

20  confronted Lazarev regarding the false representations presented to potential investors as to the

21  accuracy of the stage of product development for commercialization.  Lazarev had represented

22  that the product was in advanced development, when in reality there were serious issues with

23  product performance and Optiva's scientists in Moscow could not resolve these problems.  As a

24  result of this confrontation, Andrew Wahl's relationship with Lazarev became acrimonious.

25  Subsequently, Marty and Ferguson asked Andrew Wahl to resign as President and Chief

26  Executive Officer.  Marty took over as acting Chief Executive Officer in July 2003.

27

28  ::ODMA\PCDOCS\DOCS2\10047\8

COMPLAINT

Case No. _____

1    56.    In approximately mid- to -late-2002, AltoTech became concerned about the

2    viability of Optiva's products and planned products, and became concerned about Optiva's

3    financial stability and its decision to raise additional money through the Second Series C

4    Financing.  Specifically, AltoTech became concerned that Optiva's products did not work, that

5    the company would soon run-out of money, and that AltoTech would lose its entire investment.

6    57.    As set forth in detail below, AltoTech repeatedly demanded access to information

7    relating to Optiva, and Optiva failed and refused to provide all of the requested information.

8    Optiva refused to provide such information in order to conceal its malfeasance and to induce

9    AltoTech to refrain from taking any action against Optiva.

10    58.    On or about September 10, 2003 and October 9, 2003, Lazarev sent letters to

11    QVI's shareholders wherein he identified himself as both QVI's Chief Executive Officer and

12    Chief Technology Officer, and Optiva's Founder and Chief Technology Officer.

13    59.    In late-2003, Lazarev secured additional funding for QVI, and QVI has or will

14    merge into a new English corporate entity, Quanta Vision Limited ("QVL").  As a result of the

15    merger, Lipworth and Defendant Lazarev will substantially increase their ownership interest in

16    the QVI/QVL entity.

17    60.    The merger of QVI into QVL was intended to further conceal Defendants'

18    wrongdoing by moving QVI offshore.

19    61.    On approximately February 9, 2004, Lazarev and others were sued in the United

20    States District Court, Southern District of New York, for their double-dealing.  It was only after

21    obtaining the Complaint in that case in March 2004 that Plaintiff learned for the first time that

22    for the previous seven years Lazarev and others had been dividing their loyalties between QVI

23    and Optiva.  At all relevant times, AltoTech was completely unaware that Defendant Lazarev

24    and others had formed QVI in 1995, two years before founding Optiva.  Until March 2004,

25    Plaintiff was completely unaware of QVI's existence, or that Optiva was operating

26    simultaneously out of the same facility as QVI.

27

28    ::ODMA\PCDOCS\DOCS2\10047\8

11
COMPLAINT

Case No. _____

1    62.    Plaintiff has also recently learned, and hereby alleges that:

2    (a)    Defendant Durham was also a QVI board member and major shareholder

3    who helped Lazarev form Optiva and later became Optiva's Chairman of the Board and a major

4    Optiva shareholder;

5    (b)    Bertrand Lipworth (and Lipworth Capital), was QVI's fund raiser,

6    investment and technological adviser, and a major investor, who also joined Durham as an

7    Optiva director and major shareholder;

8    (c)    Berne Schepman -- Russian Technology Group and QVI's

9    secretary/founder/major shareholder -- also became a major Optiva shareholder;  and

10    (d)    Alla Lazarev (Pavel Lazarev's wife) has been registering patents which

11    rightfully belong to Optiva, in the name of QVI in the United States, and in the name of other

12    companies abroad.  (QVI registered at least five patents between 1997 and 2001, according to the

13    U.S. Patent and Trademark Office, Information Products Division, Technology Assessment and

14    Forecast (TAF) Branch.  Pursuant to the terms of the Written Agreements listed above, such

15    patents should have been registered in Optiva's name.)

16    63.    In direct contravention of Optiva's representations that its officers and key

17    employees would devote 100% of their business time to Optiva, Lazarev and others have been

18    raising money to further fund QVI, and have been assigning patents to QVI.  For example, and

19    without limitation, Lazarev assigned the following patents to QVI after he had agreed to devote

20    100% of his time to Optiva:

21    (a)    Patent No. 5717733 (x-ray and neutron diffractometric imaging of the

22    internal structure of objects);

23    (b)    Patent No. 5805662 (using deflected penetrating radiation to image an

24    object's internal structure);

25    (c)    Patent No. 6054712 (inspection equipment using small-angle topography

26    in determining an objects internal structure and composition);

27    (d)    Patent No. 6483891 (reduced-angle mammography device and variants);

28    ::ODMA\PCDOCS\DOCS2\10047\8

1        (e)    Patent No. 6175117 (tissue analysis apparatus); and,

2        (f)    Patent No. 6281503 (non-invasive composition analysis).

3 Contrary to its written and oral representations, Optiva, its officers, employees and consultants

4 did, in fact, have a direct or indirect ownership interest in a company or companies which

5 competed with Optiva. Without limitation, as set forth in detail below, Optiva, its officers,

6 employees and consultants had direct involvement with QVI, a competitor of Optiva.

7      64.    Contrary to its written and oral representations, Optiva's key officers did not enter

8 into employment agreements with Optiva which protected the interests of the owners of the

9 Series C Preferred Stock. Instead, Optiva's key officers divided their loyalties between Optiva

10 and QVI, to the detriment of the owners of the Series C Preferred Stock.

11      65.    Contrary to its written and oral representations, Optiva transferred, licensed or

12 otherwise jeopardized Optiva's intellectual property though its involvement with QVI, as set

13 forth in detail below.

14      66.    Contrary to its written and oral representations, each officer, employee and

15 consultant of Optiva did not execute a proprietary information and assignment of inventions

16 agreement, whereby all present or future intellectual property rights had been assigned to Optiva.

17 Instead, intellectual property rights which should have belonged exclusively to Optiva have been

18 given to QVI, and possibly other Defendants or other entities.

19      67.    Contrary to its written and oral representations, Optiva did not have valid,

20 exclusive, title, ownership and legal rights to all patents, trademarks, service marks, trade names,

21 copyrights, trade secrets, information, proprietary rights and processes employed by or proposed

22 to be employed by Optiva. Instead, as set forth in detail below, such rights are threatened by

23 QVI, and Optiva should have known of such threats through the exercise of ordinary diligence.

24      68.    Defendants and others have funneled monies from Optiva and QVI to Moscow,

25 where scientists are allegedly working to further develop the Technology and related

26 technologies. Defendants have commingled the funds raised by Optiva and QVI to fund such

27 research.

28 ::ODMA\PCDOCS\DOCS2\10047\8

69. The products manufactured by Optiva do not function properly and Optiva is unable to reproduce its laboratory results in a commercially viable manner. In short, Optiva's products and its patents are useless and of no commercial value at this time.

70. Lazarev is presently the Chairman of the QVI Board of Directors and its Chief Technology Officer, while simultaneously sitting on the Board of Directors at Optiva, and acting as Optiva's Chief Technology Officer.

71. Defendants have gone to great lengths to induce investors to invest in both QVI and Optiva, by, among other things, providing a detailed list of Defendants' prior business ventures and accomplishments. Yet none of the named Defendants ever disclosed the existence of QVI to AltoTech as a minority shareholder. No Defendant has ever disclosed to AltoTech Optiva's relationship to QVI.

72. Had AltoTech known of the relationship between QVI and Optiva, AltoTech would not have invested in Optiva.

73. The major shareholders in Optiva have benefited directly by permitting Lazarev and other Optiva employees to secretly divert their time, energy and skills, along with other Optiva corporate assets, to QVI. These defendants benefited as they deprived Optiva and its shareholders of Optiva's assets.

74. Defendants all owed an undivided duty of good faith, honesty and full disclosure in all their dealings on behalf of the Optiva. Defendants breached these duties and caused substantial damages to AltoTech.

75. At no time did any Defendant ever obtain AltoTech's consent for QVI to co-opt Optiva's resources and assets to develop QVI's products and business.

76. As set forth herein, Defendant Lazarev's wrongdoing includes, without limitation:

(a) failing to work full-time for Optiva in violation of his fiduciary duties and/or employment contract;

(b) devoting substantial time and effort to raising money for QVI;

(c) failing to develop at Optiva the technology he assigned to QVI;

1    (d) developing QVI's technology when he owed his full-time work duties to

2 Optiva;

3    (e) directing senior Optiva management scientists to work on QVI's

4 development projects including Mikhail Paukshto, Ph.D., Alla Lazarev, Ph.D., Alexander

5 Dembo, Ph.D., and the Optiva team of Russian scientists;

6    (f) installing QVI Board Members on the Optiva Board;

7    (g) engaging Bertrand Lipworth and his venture capital firm Lipworth Capital

8 to raise funds for QVI, then rewarding Lipworth for his aid to QVI with a seat on the Optiva

9 board;

10    (h) failing to apprise AltoTech of his secret QVI activities, and conducting his

11 wrongful actions without shareholder approval;

12    (i) failing to use his own extensive business contacts and knowledge for the

13 exclusive benefit of Optiva;

14    (j) raising capital for QVI and negotiating the merger of QVI and QVL at a

15 time when he should have been raising capital for Optiva;

16    (k) using the Russian Technology Group, with the aid of QVI co-founder

17 Schepman, to transfer technology between Optiva and QVI;

18    (l) co-mingling Optiva's funds, and/or personnel, and/or know-how and

19 expertise, and/or products and technology with that of QVI;

20    (m) failing to implement any reporting mechanisms to advise and obtain

21 approval from Optiva shareholders of material Optiva decisions, such as Lazarev's extensive

22 fund-raising activities for his hidden company, QVI; and,

23    (n) agreeing to return to working full-time for QVI in 2002, and taking with

24 him all of the "QVI" employees.

25   77. While Lazarev and his hand-picked board of directors were required to be

26 working exclusively for Optiva, they were also working for QVI, which was developing

27 technology, applications and products, in direct competition with Optiva.

28 ::ODMA\PCDOCS\DOCS2\10047\8

1    78.    Instead of ensuring that Optiva employees worked exclusively on Optiva

2  business, Defendant Lazarev and others, were allowing Optiva personnel and consultants

3  (including the Optiva team of Russian scientists) to work on development projects and fund

4  raising efforts for QVI.

5    79.    Instead of protecting Optiva's shareholders, the Optiva's Boards of Directors and

6  Executives were engaged in an undisclosed conflict of interest assisting Lazarev with QVI and/or

7  turning a blind eye to the malfeasance.

8    80.    Defendant Durham was actively assisting Lazarev in pursing his QVI agenda.

9    81.    Each and every Defendant, through indifference or inattentiveness, or a

10  combination of both, failed to apprise the Optiva shareholders of the conflict of interest between

11  Optiva and QVI, and the diversion of resources from Optiva to QVI.

12    82.    Defendants knowingly and/or negligently assisted Lazarev in his diversion and

13  usurpation of corporate opportunities from Optiva to QVI, and to their own benefit.

14  **Mismanagement of Optiva**

15    83.    Not only have Lazarev and other named and unnamed defendants intentionally,

16  willfully, wantonly and maliciously lied to AltoTech, they have also mismanaged Optiva.

17    84.    For example, and without limitation, Optiva gave Defendant Marty a bonus of

18  $100,000, although Optiva is not profitable and has never sold a single product.

19    85.    Optiva gave to Board Member Teisan Iki hundreds of thousands of dollars for an

20  alleged sales and marketing trip to Japan, where not a single product was sold.

21    86.    Optiva appointed Peter Hopper as Chief Executive Officer in January 2004,

22  despite the fact that Hopper lives full-time in Hong Kong and despite the fact that Optiva has no

23  operations in Hong Kong.

24    87.    AltoTech has made written demand for access to Optiva's records, and Optiva has

25  denied such access.

26    88.    Ferguson and Marty have retained Lazarev, despite his improper involvement

27  with other business entities.

28  ::ODMA\PCDOCS\DOCS2\10047\8

16
COMPLAINT

Case No. _____

## CONSPIRACY ALLEGATIONS

89.     Defendants, and each of them, and others known and unknown, intentionally and willfully combined, conspired and agreed among themselves to engage in a scheme, common plan, or joint action to injure Plaintiff through carrying out a series of tortious acts on multiple occasions. (Hereinafter the parties sued are referred to as "Defendants," unless otherwise stated.) The tortious acts in which Defendants engaged include, but are not limited to:

(a)     Creating a complex arrangement of interconnected, interrelated, and commonly-owned operating entities in order to carry out, and then cover-up, their tortious acts;

(b)     Making false and fraudulent representations to Plaintiff as to the true nature of Defendants' activities and intentions;

(c)     Failing to make full and honest representations to Plaintiff regarding the true nature of Optiva's assets, liabilities, financial condition, financial operations and products;

(d)     Failing and refusing to make available to Plaintiff documents relating to Optiva's assets, liabilities, financial condition, financial operations and products, as required by contract and by law to do;

(e)     Failing to make full and honest representations to Plaintiff regarding Defendants' involvement in business ventures which are in direct competition with Optiva;

(f)     Paying excessive and unauthorized development and other fees, and mishandling the treatment of such fees; and

(g)     Self-dealing.

90.     These actions were taken, and false promises and misrepresentations made, for the purpose of having Plaintiff rely on them. Defendants knew that Plaintiff would invest in Optiva in reliance on the conspirators' actions and representations, and knew that if Plaintiff was kept in the dark, it would be unaware of the need to take measures to protect itself from Defendants' malfeasance.

91.     Plaintiff has suffered and continues to suffer irreparable injury and damages as the result of acts jointly undertaken, in furtherance of the conspiracy, by Defendants, and each of

1    them, including but not limited to, loss of investment value in Optiva and payments to

2    accountants and lawyers.

3         92.    Defendants, and each of them, furthered the conspiracy by (a) participating in the

4    scheme to injure and defraud Plaintiff; (b) lending aid and encouragement to the wrongful action

5    of the other Defendants and conspirators; and (c) ratifying or adopting the wrongful acts of the

6    other Defendants and conspirators.

7         93.    The formation of the conspiracy and the acts of Defendants were deliberately

8    undertaken beginning in the mid-1990's and continuing up to the present. Defendants

9    deliberately concealed the formation and existence of the conspiracy. At no time during the

10   formation of the conspiracy or during the conspiracy itself was Plaintiff aware that such a

11   conspiracy had been formed or that a conspiracy existed. Defendants' conduct was undertaken

12   with the knowledge and intended effect of causing the maximum irreparable injury and monetary

13   damage to Plaintiff.

14                          **ALTER EGO ALLEGATIONS**

15        94.    There was, and is, a unity of interest and ownership between and among the

16   individual defendants on the one hand, and the corporate entity defendants that they control, on

17   the other hand, such that these individual defendants are the alter egos of the corporate

18   defendants herein. The individual defendants hold themselves out as the owners of, and

19   dominate and control the corporate defendants to such an extent that any individuality among

20   them has ceased. The corporate defendants are mere shells or fronts used by the individual

21   defendants as conduits and pure agents for the conduct of their business, property and affairs and

22   without observance of, and with complete disregard for, proper corporate formalities. It is

23   therefore appropriate to pierce the corporate veils of the corporate defendants and impose

24   liability on their shareholders for the obligations of such corporations.

25        95.    The corporate defendants were operated pursuant to a scheme, whereby the

26   income, revenue and profits of the corporate defendants were diverted and commingled with the

27   personal assets of the individual defendants. The corporate defendants were operated by the

28   ::ODMA\PCDOCS\DOCS2\10047\8

18

COMPLAINT

Case No. _____

1   individual defendants in a manner and fashion designed to "loot" Optiva and evade the

2   defendants' liability to creditors, including, but not limited to, Plaintiff. By virtue of the

3   foregoing allegations, adherence to the fiction of any separate corporate existence of the

4   corporate defendants would sanction fraud and promote injustice and would permit Defendants

5   to escape legal liability for their actions.

6                              **CLAIMS FOR RELIEF**

7                           **FIRST CLAIM FOR RELIEF**
          Violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10(b)5
8                     (Against all Defendants except Ferguson and Marty)

9        96.    All of the foregoing paragraphs are incorporated herein by reference.

10       97.    Defendants knew or had access to the material adverse non-public information

11  about their intended performance of their obligations under the written agreements described

12  above. Specifically, Defendants induced AltoTech to purchase shares in the Optiva, even though

13  Defendants had no intention of fulfilling their obligations under the written agreements, as set

14  forth above.

15       98.    By signing the Written Agreements, Defendants misrepresented to AltoTech that:

16          (a)    Optiva's executives and key personnel would devote 100% of their

17  business time to Optiva;

18          (b)    neither Optiva, its officers, employees nor consultants had or would have

19  any direct or indirect ownership interest in any company which competed with Optiva;

20          (c)    Optiva's key officers would enter into employment agreements with

21  Optiva which would protect the interests of the owners of the Series C Preferred Stock;

22          (d)    Optiva would not take any action to effect any fundamental change to its

23  business;

24          (e)    Optiva would not transfer, license or otherwise jeopardize Optiva's

25  intellectual property;

26          (f)    each officer, employee and consultant of Optiva had executed a

27  proprietary information and assignment of inventions agreement, whereby all present or future

28  ::ODMA\PCDOCS\DOCS2\10047\8                  19
                                          COMPLAINT
                                                          Case No. _____

1   intellectual property rights had been assigned to Optiva;

2          (g)    Optiva had valid, exclusive, title, ownership and legal rights to all patents,

3   trademarks, service marks, trade names, copyrights, trade secrets, information, proprietary rights

4   and processes employed by or proposed to be employed by Optiva;  and,

5          (h)    Optiva had a saleable product.

6          99.    But Defendants entered into these agreements knowing full well that they did not

7   intend to perform the obligations that they were assuming.  Defendants' fraudulent intentions are

8   evidenced by their continuing failure to comply with their obligations, and their hidden

9   relationship with QVI.  Defendants never disclosed to AltoTech that they did not intend to

10  perform their obligations, nor did they disclose their relationship with QVI.  Defendants

11  participated in drafting, reviewing, approving and disseminating misleading statements and other

12  misrepresentations of and about the written agreements and the investments that AltoTech was

13  undertaking.

14         100.   Defendants, with knowledge of the truth, disseminated or approved false

15  statements about their intentions and their relationship with QVI, which were misleading in that

16  they contained misrepresentations of fact and failed to disclose material facts that they had a duty

17  to disclose or that were necessary to make their statements not be misleading.

18         101.   Defendants violated § 10(b) of the Securities Exchange Act of 1934 and Rule

19  10(b)5 promulgated thereunder in that they:

20         (a)    Employed devices, schemes and artifices to defraud;

21         (b)    Made untrue statements of material facts or omitted to state material facts that

22  they had a duty to disclose or that were necessary to make their statements not be misleading;

23  and

24         (c)    Engaged in acts, practices and a course of business that operated as a fraud or

25  deceit upon plaintiffs in connection with their purchase of securities, as set forth above.

26

27

28  ::ODMA\PCDOCS\DOCS2\10047\8                        20
                                              COMPLAINT
                                                                       Case No. _____

1    102.    Defendants violated § 10(b) of the Securities Exchange Act of 1934 and Rule

2   10(b)5 promulgated thereunder in that they intentionally omitted to disclose the relationship

3   between QVI and Optiva.

4    103.    AltoTech justifiably relied on Defendants' misrepresentations, and entered into

5   the written agreements described above, and purchased the shares described above.

6    104.    The shares in Optiva described above are "securities" as defined by § 2(1) of the

7   Securities Exchange Act.

8    105.    As a direct, proximate and foreseeable result of AltoTech's reliance on

9   Defendants' misrepresentations and omissions, AltoTech suffered monetary losses in an amount

10   to be determined at trial.

**SECOND CLAIM FOR RELIEF**
Violation of California Corporations Code Section 25401
(Against all Defendants except Ferguson and Marty)

13    106.    All of the foregoing paragraphs are incorporated herein by reference.

14    107.    Defendants made written and oral communications in connection with the sale of

15   Optiva shares of Series C Preferred Stock, as described more fully above.

16    108.    By signing the written agreements in connection with the sale of securities,

17   Defendants made untrue statements of a material fact as follows:

18    (a)    Optiva's executives and key personnel would devote 100% of their

19   business time to Optiva;

20    (b)    neither Optiva, its officers, employees nor consultants had or would have

21   any direct or indirect ownership interest in any company which competed with Optiva;

22    (c)    Optiva's key officers would enter into employment agreements with

23   Optiva which would protect the interests of the owners of the Series C Preferred Stock;

24    (d)    Optiva would not take any action to effect any fundamental change to its

25   business;

26    (e)    Optiva would not transfer, license or otherwise jeopardize Optiva's

27   intellectual property;

28   ::ODMA\PCDOCS\DOCS2\10047\8

21

COMPLAINT

Case No. _____

1      (f)    each officer, employee and consultant of Optiva had executed a

2    proprietary information and assignment of inventions agreement, whereby all present or future

3    intellectual property rights had been assigned to Optiva;

4      (g)    Optiva had valid, exclusive, title, ownership and legal rights to all patents,

5    trademarks, service marks, trade names, copyrights, trade secrets, information, proprietary rights

6    and processes employed by or proposed to be employed by Optiva; and,

7      (h)    Optiva had a saleable product.

8    109.    Defendants violated California Corporations Code § 25401 in that they:

9      (a)    sold Optiva shares of Series C Preferred Stock in this state by means of a

10    written agreement; and

11      (b)    made untrue statements of material facts or omitted to state material facts

12    that they had a duty to disclose or that were necessary to make their statements not misleading, in

13    connection with the sale of the of the Series C Preferred Stock.

14    110.    The Series C Preferred Stock described above are securities, as defined by

15    California Corporations Code § 25019.

16    111.    As a direct, proximate, and foreseeable result of AltoTech's reliance on

17    Defendants' untrue statements of material fact and omissions of material facts, AltoTech suffered

18    monetary losses in an amount to be determined at trial.

19                        **THIRD CLAIM FOR RELIEF**
                    Violation of California Corporation Code Section 25400
20                    (Against all Defendants except Ferguson and Marty)

21    112.    All of the foregoing paragraphs are incorporated herein by reference.

22    113.    Defendants fraudulently induced Plaintiff to invest in Optiva by making false or

23    misleading statements with respect to material facts in connection with the sale of Optiva Series

24    C Preferred Stock. In particular, when Defendants entered into the Written Agreements

25    described above they had no intention of fulfilling their obligation under these agreements

26    despite their express representations that they would fulfill such obligations.

27

28    ::ODMA\PCDOCS\DOCS2\10047\8

Case No. _____

114.   Moreover, throughout the course of the business dealings between Plaintiff on the one hand and Defendants on the other hand, Defendants made continual misrepresentations and omissions of material fact as to their compliance with the written agreements and their responsibilities and duties thereunder so as to prevent Plaintiff from discovering the true fact as to their compliance with the written agreements and their responsibilities and duties thereunder so as to prevent Plaintiff from discovering the true facts that Defendants were defrauding and conspiring to defend Plaintiff at all relevant times herein.

115.   Defendants led Plaintiff to believe that Optiva could develop a marketable product, when in reality Optiva has never sold any products.

116.   Defendants led Plaintiff to believe that Optiva and its agents would not engage in activities designed to compete with Optiva, when in reality Optiva and its agents were simultaneously working to promote QVI, and now appear to be working to promote QVL.

117.   Defendants, with knowledge of the truth, disseminated or approved false statements about their intentions. These statements were misleading in that they contained misrepresentations about Defendants' intention to perform under the Written Agreements and failed to disclose the material facts necessary to make the statements not misleading.

118.   Defendants made these false and misleading statements with respect to a material fact with the intention that Plaintiff would rely and act upon them.

119.   Plaintiff justifiably relied on these misrepresentations, and entered into the Written Agreements described above.

120.   As a direct, proximate, and foreseeable result of AltoTech's reliance on Defendants fraud, Plaintiff suffered monetary losses in an amount to be determined at trial.

176.   The aforementioned conduct of Defendants was willful, malicious, fraudulent and oppressive, subjecting defendants to liability for punitive damages in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF
Violation of California Corporations Code Section 1507
(Against All Defendants)

121.    All of the foregoing paragraphs are incorporated herein by reference.

122.    Defendants are officers, directors, employees or agents of Optiva.

123.    By the acts described herein, Defendants made, issued, delivered or published a prospectus, report, circular, certificate, financial statement, balance sheet, public notice or document respecting Optiva or it shares, assets, liabilities, capital, dividends, business, earnings or accounts which were false in material respects, and Defendants knew them to be false, or participated in the making, issuance, delivery or publication thereof with knowledge that the same was false in a material respect.

176.    The aforementioned conduct of Defendants was willful, malicious, fraudulent and oppressive, subjecting defendants to liability for punitive damages in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF
Breach of Written Contract
(Against Optiva)

124.    All of the foregoing paragraphs are herein incorporated by reference.

125.    Plaintiff entered into the Written Agreements, described in detail above, with the above-named defendants.

126.    Plaintiff has fully performed all of its obligations under these agreements, or, alternatively, Plaintiff is excused from performing such obligations.

127.    Defendants have repeatedly and without justification breached their obligations under these agreements by, without limitation, in the following manner:

(a)    allowing Optiva, its officers, employees and consultants to have direct or indirect ownership interest in a company (or companies) which competed with Optiva;

(b)    failing to obtain from Optiva's key officers employment agreements with Optiva which would protect the interests of the owners of the Series C Preferred Stock;

(c)    transferring, licensing or otherwise jeopardizing Optiva's intellectual

::ODMA\PCDOCS\DOCS2\10047\8

24

COMPLAINT

Case No. _____

1   property;

2            (d)      failing to obtain from each officer, employee and consultant a proprietary

3   information and assignment of inventions agreement, whereby all present or future intellectual

4   property rights had been assigned to Optiva;

5            (e)      failing to secure valid, exclusive, title, ownership and legal rights to all

6   patents, trademarks, service marks, trade names, copyrights, trade secrets, information,

7   proprietary rights and processes employed by or proposed to be employed by Optiva;  and

8            (f)       failing to develop a working product.

9        128.   On or about March 10, 2004, AltoTech made written demand of Optiva for the

10   following documents: a) Balance sheets, profit and loss statements, and cashflow statements for

11   January and February 2004;  b) All minutes and resolutions of the Board of Directors from

12   August 2003 to the present;  c) The 2004 Business Plan, including any amendments or revisions

13   thereto;  d)  Quarterly sales projections for September 2003 and December 2003;  e) Product

14   Sheets of all product(s) available for sale; and, f) Any communications with potential

15   customers/partners concerning issues of "not meeting product specifications."

16        129.   Optiva failed and refused to make available to AltoTech the foregoing documents,

17   despite its obligations to do so under the SBIC letter and other written agreements listed herein.

18        130.   As a direct, proximate and foreseeable result of Defendants' breaches of contract,

19   Plaintiff suffered monetary losses in an amount to be determined at trial.  Under the terms of the

20   written agreements, Plaintiff is also entitled to recover its attorneys' fees.

### SIXTH CLAIM FOR RELIEF
Breach of the Covenant of Good Faith and Fair Dealing
(Against Optiva)

23        131.   All of the foregoing paragraphs are incorporated herein by reference.

24        132.   In acting as alleged above, the above-named defendants breached the covenant of

25   good faith and fair dealing implicit in the Written Agreements, whereby each party to a contract

26   covenants not to deprive the other of the benefits of its rights under such agreements.

27

28   ::ODMA\PCDOCS\DOCS2\10047\8

<div align="center">25<br>COMPLAINT</div>

Case No. _____

1    133.    By their actions, as set forth above, defendants breached these covenants of good

2  faith and fair dealing.

3    134.    As a direct, proximate and foreseeable result of defendants' wrongful breaches,

4  Plaintiff suffered monetary losses in an amount to be determined at trial.

5                    **SEVENTH CLAIM FOR RELIEF**
                    Breach of Fiduciary Duty
6                    (Against All Defendants)

7    135.    All of the foregoing paragraphs are incorporated herein by reference.

8    136.    The above-named defendants owed a fiduciary duty to Plaintiff. The Written

9  Agreements make clear that defendants owe Plaintiff a fiduciary duty. Defendants breached the

10  fiduciary duties they owed to plaintiff by, among other things,

11            (a)    concealing from Plaintiff the relationship between Optiva and QVI;

12            (b)    concealing from Plaintiff documents relating to the management of

13  Optiva;

14            (c)    allowing Optiva, its officers, employees and consultants to have direct or

15  indirect ownership interest in a company (or companies) which competed with Optiva;

16            (d)    failing to obtain from Optiva's key officers employment agreements with

17  Optiva which would protect the interests of the owners of the Series C Preferred Stock;

18            (e)    transferring, licensing or otherwise jeopardizing Optiva's intellectual

19  property;

20            (f)    failing to obtain from each officer, employee and consultant a proprietary

21  information and assignment of inventions agreement, whereby all present or future intellectual

22  property rights had been assigned to Optiva;

23            (g)    failing to secure valid, exclusive, title, ownership and legal rights to all

24  patents, trademarks, service marks, trade names, copyrights, trade secrets, information,

25  proprietary rights and processes employed by or proposed to be employed by Optiva;

26            (h)    failing to use their best efforts to develop a saleable product.

27

28  ::ODMA\PCDOCS\DOCS2\10047\8                26
                                        COMPLAINT
                                                      Case No. _____

137.    As a direct, proximate and foreseeable result of defendants' breach of their fiduciary duties, plaintiff suffered monetary losses in to be determined at trial.

138.    The aforementioned conduct of defendants was willful, malicious, fraudulent and oppressive, subjecting defendants to liability for punitive damages in an amount to be determined at trial.

### EIGHTH CLAIM FOR RELIEF
Negligent Misrepresentation and Omission
(Against all Defendants)

139.    All of the foregoing paragraphs are incorporated herein by reference.

140.    Defendants owed Plaintiff a duty to make the representations that they voluntarily made, as described above, with due care.

141.    The representations set forth above were made at a time when Defendants, with reasonable diligence, should have known that they were false and incomplete, and at a time when Defendants, with reasonable diligence, should have known that Plaintiff would be detrimentally affected by relying on the representations.

142.    The misrepresentations, omissions and suppressions of fact by Defendants were made in order to induce Plaintiff to enter into the Written Agreements, and to refrain from pursuing legal recourse against Defendants.

143.    Plaintiff did, in fact, reasonably rely on Defendants' representations, omissions and suppressions of fact.  Had Plaintiff known the true facts regarding Defendants' relationship with QVI, Plaintiff would have taken additional steps to protect its interests, or would not have entered into the Written Agreements with Defendants.

144.    As a direct, proximate, and foreseeable result of breach of duties by Defendants, Plaintiff suffered monetary losses in an amount to be determined at trial.

### NINTH CLAIM FOR RELIEF
Fraud and Conspiracy to Commit Fraud
(Against all Defendants Except Ferguson and Marty)

145.    All of the foregoing paragraphs are incorporated herein by reference.

1    146.    Defendants fraudulently induced Plaintiff to invest in Optiva by making false

2    material statements about their intentions. In particular, when defendants entered into the

3    Written Agreements described above they had no intention of fulfilling their obligations under

4    these agreements despite their express representations that they would fulfill such obligations.

5    147.    Moreover, throughout the course of the business dealings between Plaintiff on the

6    one hand and Defendants on the other hand, Defendants made continual misrepresentations and

7    omissions of material fact as to their compliance with the written agreements and their

8    responsibilities and duties thereunder so as to prevent Plaintiff from discovering the true facts

9    that Defendants were defrauding and conspiring to defraud Plaintiff at all relevant times herein.

10    148.    Defendants led Plaintiff to believe that Optiva could develop a marketable

11    product, when in reality Optiva has never sold any products.

12    149.    Defendants led Plaintiff to believe that Optiva and its agents would not engage in

13    activities designed to compete with Optiva, when in reality Optiva and its agents were

14    simultaneously working to promote QVI, and now appear to be working to promote QVL.

15    150.    Defendants, with knowledge of the truth, disseminated or approved false

16    statements about their intentions. These statements were misleading in that they contained

17    misrepresentations about Defendants' intention to perform under the written agreements and

18    failed to disclose the material facts necessary to make the statements not misleading.

19    151.    Defendants made these misrepresentations and omissions with the intention that

20    Plaintiff would rely and act upon them.

21    152.    Plaintiff justifiably relied on these misrepresentations, and entered into the written

22    agreements described above.

23    153.    By and through their activities in connection with management of Optiva and the

24    written agreements detailed above and other cooperative efforts, Defendants have conspired with

25    each other to commit the tortious acts described above. Defendants acted in concert, and

26    combined and conspired to defraud Plaintiff in order to further their own interests at the expense

27    of and before those of Plaintiff.

28    ::ODMA\PCDOCS\DOCS2\10047\8

28

COMPLAINT

Case No. _____

154.   Acting in furtherance of the conspiracy, Defendants have committed the tortious acts described above.

155.   As a direct, proximate and foreseeable result of Plaintiff's reliance on Defendants' fraud and conspiracy to commit fraud, Plaintiff suffered monetary losses in an amount to be determined at trial.  Because of their participation in the conspiracy, Defendants are jointly and severally liable to Plaintiff for their wrongful conduct.

156.   The aforementioned conduct of Defendants was willful, malicious, fraudulent and oppressive, subjecting defendants to liability for punitive damages in an amount to be determined at trial.

### TENTH CLAIM FOR RELIEF
Unjust Enrichment
(Against all Defendants)

157.   All of the foregoing paragraphs are incorporated herein by reference.

158.   Defendants wrongfully induced Plaintiff to enter into the Written Agreements described above.  Optiva never intended to perform its obligations under these agreements. Through intentional acts of fraud designed to conceal the truth from and to mislead Plaintiff, all Defendants unjustly enriched themselves at Plaintiff'' expense and detriment.

159.   In the interests of equity and fairness, Defendants must be prevented from receiving, retaining, and appropriating monies and benefits as a direct result of their wrongful acts.

160.   As a direct, proximate and foreseeable result of their wrongful acts, Defendants were unjustly enriched in an amount to be determined at trial.

### ELEVENTH CLAIM FOR RELIEF
An Action in Equity for an Accounting
(Against Optiva)

161.   All of the foregoing paragraphs are incorporated herein by reference.

162.   Pursuant to the terms of the Written Agreements, Optiva has custody and control over its accounting records.  As set forth in the Written Agreements, Optiva is required to periodically and regularly report to AltoTech regarding the financial condition of the company.

1  However, to date, in many instances, Optiva has not provided AltoTech with the required

2  reports.

3       163.  On or about March 10, 2004, AltoTech made written demand of Optiva for the

4  following documents:  a) Balance sheets, profit and loss statements, and cashflow statements for

5  January and February 2004;  b) All minutes and resolutions of the Board of Directors from

6  August 2003 to the present;  c) The 2004 Business Plan, including any amendments or revisions

7  thereto;  d)  Quarterly sales projections for September 2003 and December 2003;  e) Product

8  Sheets of all product(s) available for sale; and, f) Any communications with potential

9  customers/partners concerning issues of "not meeting product specifications."  Defendants have

10  failed and refused, and continue to fail and refuse, to provide such an accounting and other

11  documents.

12       164.  The magnitude and extent of defendants' improper actions cannot be fully

13  ascertained without an accounting .  Accordingly, Defendants should be compelled to honor the

14  reporting requirements of the various written agreements, and provide a full accounting.

**TWELFTH CLAIM FOR RELIEF**
Violations of California Business & Professions Code § 17200 et seq.
(Against all Defendants)

17       165.  All of the foregoing paragraphs are incorporated herein by reference.

18       166.  California Business and Professions Code § 17200 et seq. defines unfair

19  competition to include "unlawful, unfair or fraudulent business practices and unfair, deceptive,

20  untrue or misleading advertising."  By committing the acts alleged above, Defendants have

21  engaged in unlawful, unfair and fraudulent business practices within the meaning of Business

22  and Professions Code § 17200 et seq.

23       167.  As a direct and proximate result of their unlawful, unfair and fraudulent business

24  practices, Defendants received and continue to hold ill-gotten gains belonging to Plaintiffs.

25  These gains obtained through Defendants' violations of Business and Professions Code § 17200

26  et seq. include, but are not limited to, all monies paid to Optiva by AltoTech, along with any

27  profits earned.  Plaintiff is therefore entitled to disgorgement and restitution of all such monies

28  ::ODMA\PCDOCS\DOCS2\10047\8

30
COMPLAINT

Case No. _____

1 and preliminary and permanent injunctive relief against Defendants to prevent any further acts of

2 unfair competition, including immediate and full disclosure by Defendants of the relationship

3 between Defendants and QVI, and any other relationships Defendants may have which conflict

4 with the interests of Optiva.

### THIRTEENTH CLAIM FOR RELIEF
#### Declaratory Judgment and Specific Performance
#### (Against All Defendants)

7     168.    All of the foregoing paragraphs are incorporated herein by reference.

8     169.    An actual controversy has arisen and now exists between Plaintiff and the above-

9 named Defendants concerning their respective rights and duties under the Written Agreements.

10     170.    Plaintiff desires a judicial declaration which is necessary and appropriate at this

11 time under the circumstances in order that Plaintiff may ascertain its rights and duties under the

12 Written Agreements.

13     171.    Plaintiff seeks a declaratory judgment pursuant to 28 U.S.C. §2201 and Rule 57 of

14 the Federal Rules of Civil procedure declaring:

15           a.    AltoTech is entitled to receive the documents and information requested in

16              its March 10, 2004 letter;

17           b.    The true owner of any patents assigned by Defendants to QVI;

18           c.    The true owner of any intellectual property developed by Pavel and/or

19              Optiva.

20     172.    Plaintiff has demanded that Defendants cure their unlawful and wrongful conduct,

21 but Defendants have refused and still refuse to refrain from said conduct.

22     173.    The wrongful conduct of Defendants, unless and until enjoined and restrained by

23 order of this Court, will cause great and irreparable injury to Plaintiff in that its investment in

24 Optiva will continue to be harmed.

25     174.    Plaintiff has no adequate remedy at law for the injuries sustained and it is

26 impossible to determine the precise amount of damage that will be suffered if Defendants'

27 conduct is not restrained and enjoined. The Written Agreements recognize that in a case of

28 ::ODMA\PCDOCS\DOCS2\10047\8

<div align="center">31</div>
<div align="center">COMPLAINT</div>

Case No. _____

1    breach by Defendants of their duties and obligations, Plaintiff would have no adequate remedy at

2    law. The Court is therefore respectfully requested to issue preliminary and permanent injunctive

3    relief commanding specific performance of each of the Written Agreements.

### FOURTEENTH CLAIM FOR RELIEF
4

Rescission

5    (Against Optiva)

6      175.   All of the foregoing paragraphs are incorporated herein by reference.

7      176.   AltoTech entered into the Written Agreements in reliance on Defendants'

8    fraudulent representations.

9      177.   Plaintiff therefore seek rescission of the Written Agreements and the repayment

10    by Defendants of all monies paid to Optiva by AltoTech, plus interest and expenses, the exact

11    amount of which to be determined at trial.

### FIFTEENTH CLAIM FOR RELIEF
12

Injunction

13    (Against All Defendants)

14      178.   All of the foregoing paragraphs are incorporated herein by reference.

15      179.   As set forth herein, Defendants and others acting in concert with them have or

16    will infringe Optiva's patents.

17      180.   As set forth herein, Defendants and others acting in concert with them have or

18    will engage in unfair competition.

19      181.   As set forth herein, Defendants and others acting in concert with them have or

20    will misappropriate Optiva's trade secrets.

21      182.   As set forth herein, Lazarev and others are devoting their business time to entities

22    other than Optiva.

23      183.   Unless restrained, Defendants will continue to engage in the unlawful activities

24    described herein.

25      184.   The actions by Defendants have caused and will cause irreparable harm to

26    Plaintiff, and Plaintiff has no adequate remedy at law.

27

28    ::ODMA\PCDOCS\DOCS2\10047\8

Case No. _____

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants for the following relief:

1.      Actual and consequential damages caused by Defendants' wrongful conduct, the actual amount of damages to be determined at trial;

2.      An order requiring Defendants to provide the requested documents to AltoTech;

3.      An order requiring Defendants to disgorge the monies they wrongfully obtained from their tortious practices;

4.      An order requiring Defendants to restore to AltoTech all wrongfully obtained monies;

5.      Permanent injunctive relief prohibiting Defendants and anyone acting in concert with them from infringing Optiva's patents;

6.      Permanent injunctive relief prohibiting Defendants and anyone acting in concert with them from unfairly competing with Optiva;

7.      Permanent injunctive relief prohibiting Defendants and anyone acting in concert with them from misappropriating Optiva's trade secrets;

8.      An order for an accounting;

9.      Pre- and post-judgment interest on damages;

10.     Attorneys' fees and costs of court as applicable by law; and

11.     Such further relief as the Court deems just and appropriate.

Respectfully submitted,

Dated: April 14, 2004

LINER YANKELEVITZ
SUNSHINE & REGENSTREIF LLP

By: _____
        Jonathan S. Kitchen
Attorneys for Plaintiff
AltoTech II, LP.

::ODMA\PCDOCS\DOCS2\10047\8

33

COMPLAINT

Case No. _____

1

## DEMAND FOR JURY TRIAL

2      Plaintiff demands a trial by jury.

3    Dated: April 14, 2004

LINER YANKELEVITZ
SUNSHINE & REGENSTREIF LLP

4

5

6    By:

7        Jonathan S. Kitchen
Attorneys for Plaintiff
AltoTech II, LP

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28   ::ODMA\PCDOCS\DOCS2\10047\8

34
COMPLAINT

Case No. _____

EXHIBIT E

MAR 28 '07 01:12PM SBA

P.6/18

*C9/79-043)*
*6-7*

## AltoTech Ventures

www.altotechventures.com

August 4, 2004

Mr. Michael Donadieu
U.S. Small Business Administration
409 3rd Street, SW
Suite 6300
Washington, DC 20416

11-08-04P01:44 RCVD

Re: Optiva

Mr. Donadieu,

Pursuant to your letter dated July 27, 2004 please find enclosed our response addressed to Steve Knott.

Should you require any additional information please don't hesitate to contact us.

Sincerely,

*Gloria Wahl*

Gloria Wahl
Manager

cc: Mr. Steve Knott

July 27, 2004

Mr. Steve Knott
Financial Analyst – Investment Division
U. S. Small Business Administration
409 Third Street SW, 6th floor
Washington, DC 20416

Dear Steve,

Based on our conversation, we have made a full review of our investment in Optiva Inc. on June 2002. After review and in consultation with Mike Staebler of Pepper Hamilton LLC, we acknowledge that AltoTech should have terminated its discussions with Optiva and reversed its decision to go forward once Optiva had retained Andrew Wahl. The decision to invest was based on a misunderstanding of the applicable regulation and an honest mistake. For your information, Andrew Wahl is no longer involved with Optiva and Optiva continues to enjoy support of its lead investors as evidenced by the closing of $6.5 million in bridge loan on July 9, 2004. CIBC World Markets is now marketing a $30 million private placement for Optiva Series D Preferred Stock.

As background, the opportunity to invest in Optiva was referred to AltoTech in November 2001. The GPs thought Optiva had an interesting technology in an up-and-coming nanotech space, which has a potential for a very large market. Optiva was seeking seasoned executives while AltoTech continued it's due diligence and discussion with other committed and potential investors in January and February 2002. Two Optiva consultants referred Pavel Lazarev, the Founder and CEO of Optiva, to Andrew Wahl, who they had come to know in the course of performing services for Mr. Wahl's then-current employer, PCTel, Inc.  In March 2002, Andrew Wahl joined Optiva as CFO and was promoted to CEO in May 2002. Mr. Wahl's total compensation was his salary, which was equal to Pavel Lazarev, CTO, and stock options with a 12-month cliff vesting. AltoTech made a formal commitment for $1.5 million out of a $30 million round in Series C Preferred in May 2002. The Series C Preferred has 25% warrant coverage if Optiva does not reach $45 million in revenue by 12/31/2004. At the first closing in June 2002, Andrew Wahl personally invested $55,000 in Series C Preferred. Mr. Wahl did not receive any bonus or other compensation in connection with the closing of the Series C Preferred round.

Andrew Wahl left Optiva in June 2003 because of differences with founder Pavel Lazarev concerning sales, marketing, and product development issues.

Starting in September 2003, Optiva stopped providing AltoTech and other investors with detailed financials and Board packages. AltoTech requested this information in reliance on its information rights agreement with Optiva. Optiva refused, claiming through their attorney that AltoTech had no right to get anything other than quarterly financial and no right to the 2004 Business Plan.

In March 2004, our attorney informed us that Prism Ventures LLC had filed a lawsuit against Optiva and some of its board members in New York for fraud relating to a company called QVI. The lawsuit also involved Pavel Lazarev. Based in part on his discussions with counsel for Prism Ventures, our attorney advised AltoTech to file a lawsuit to protect its investment and at the same time obtain the detailed information concerning Optiva's performance and business plan to which AltoTech was entitled.

We understand now that regardless of when a conflict arises in the investment cycle, an SBIC may not invest in a company when a conflict exists. We will use our best efforts to ensure that there are no misunderstandings concerning the SBIC regulations concerning conflicts of interest of this kind in the future.

Sincerely,



Gloria C. Wahl
Manager



ENCL.